Lee FRISSELL, Appellant,

v.

Frank L. RIZZO, Mayor of the City of Philadelphia and Sheldon L. Albert, City Solicitor of the City of Philadelphia and City of Philadelphia, Pennsylvania.

No. 78–1863.

United States Court of Appeals, Third Circuit.

Argued Dec. 12, 1978.

Decided Feb. 20, 1979.

Richard A. Ash, Lyman & Ash, Philadelphia, Pa., for appellant.

Sheldon L. Albert, City Sol., James M. Penny, Jr., Deputy City Sol., Tyler E. Wren, Asst. City Sol., for appellees.

Before GIBBONS, VAN DUSEN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

In this civil rights action we consider when, if ever, a citizen and taxpayer is entitled to bring suit to redress a First Amendment injury to his relationship with a newspaper. The district court dismissed the complaint for want of standing. We conclude that, while in some instances of First Amendment injury recognition of a newspaper reader's standing might be proper, this case is not one of them. We therefore affirm.

## I. FACTS AND PROCEEDINGS BELOW

This lawsuit arises out of a dispute between Mayor Frank Rizzo of Philadelphia

and the Philadelphia Evening Bulletin, a major newspaper in that community. On June 11, 1978, the Bulletin published a report that the City of Philadelphia had begun negotiations with American Family Life Assurance Company, an out-of-state insurance firm, concerning a program of optional cancer insurance for City employees. The local representative of American Family, Alfred E. Smith O'Neill, was a leader in the then current drive to revise the Philadelphia City Charter to permit Mayor Rizzo to seek a third term of office.

Mayor Rizzo was apparently upset by the Bulletin's report. He called the managing editor of the paper and denounced as false its account of the negotiations. The Bulletin stood by its story. On Tuesday, June 13, 1978, the Mayor announced to the press that he had instructed City officials to withdraw all of the City's legal advertising from the Bulletin "forever—or as long as I'm Mayor." He made it plain that the withdrawal of advertising was a response to the Bulletin's story, and was punitive in nature. As he put it: "You have to hit them in the pocketbook, where it hurts." The gross value of the advertising withdrawn is alleged to be $280,000 per annum.

On June 15, appellant Frissell brought this action under the Civil Rights Act of 1871, 42 U.S.C. § 1983, naming as defendants the Mayor, the City Solicitor, and the City itself. The complaint alleged that appellant was a resident, taxpayer, and registered voter of Philadelphia. It claimed that the effect of the withdrawal of advertising from the Bulletin was "to chill and inhibit freedom of the press and freedom of expression in the City, to the detriment of plaintiff and other citizens." The relief sought included preliminary and permanent injunctions barring the defendants "from denying newspapers customary public advertising as a reprisal for publication of news articles deemed offensive by the Mayor."

At the hearing on the motion for a preliminary injunction, the district judge, *sua sponte*, raised the issue of plaintiff's standing to bring the action. After hearing argument, the judge dismissed the complaint for lack of standing. This appeal followed.

## II. THE LEGAL ISSUE

■■■ Broadly put, the question raised by a dismissal for want of standing is "whether the litigant is entitled to have the court decide the merits" of the legal controversy before it. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). This inquiry normally turns not upon "the fitness for adjudication . . . of the legal questions" at issue, but rather on "the nature and sufficiency of the litigant's concern with the subject matter of the litigation." [1] The Supreme Court has recently followed a two stage analysis of standing. First, it has required that the claimant demonstrate that he, himself, has been exposed to some actual or threatened injury. *E. g., Linda R. S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). This requirement is related to the constitutional limitation of the judicial power to "cases and controversies," and reflects the traditional notion that "Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party." *Warth v. Seldin, supra*, 422 U.S. at 499, 95 S.Ct. at 2205. The legislative and coercive powers of an Art. III court are therefore properly invoked only in aid of that remedial function, not as an independent justification for the exercise of jurisdiction.

■■■ Once the court finds Art. III, or "pure" standing, it must then determine whether the claim is barred by nonconstitutional, prudential limitations on the exercise of its jurisdiction. *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 72–82, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Singleton v. Wulff*, 428 U.S. 106, 112, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976);

---

1. P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, The Federal Courts and the Federal System 156 (2d ed. 1973).

*Warth v. Seldin, supra,* 422 U.S. at 498, 95 S.Ct. 2197. Where the harm asserted is "a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens" that fact counsels against the exercise of jurisdiction. *E. g., Warth v. Seldin, supra,* 422 U.S. at 499, 95 S.Ct. at 2205; *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 220, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *United States v. Richardson,* 418 U.S. 166, 176–78, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). Closely related to this prudential standard is the general rule barring, outside of a narrowly limited class of cases, suits in which standing is rested on one's status as a federal taxpayer. *Frothingham v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923); *cf. Flast v. Cohen,* 392 U.S. 83, 114, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (Stewart, J., concurring). And even when a litigant has demonstrated a concrete and particularized injury to himself, he is usually permitted to assert only his own legal rights as a ground for decision in his favor, not those of third parties not before the court. *Warth v. Seldin, supra,* 422 U.S. at 499, 514, 95 S.Ct. 2197; *United States v. Raines,* 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960).

 Several justifications for these standing rules have been articulated. One is judicial economy. The federal courts have an institutional interest in avoiding the costs of adjudication unless the requested relief is genuinely needed. The requirement that an injury capable of redress be pleaded and proved helps to provide that assurance. *Schlesinger v. Reservists to Stop the War, supra,* 418 U.S. at 221, 94 S.Ct. 2925. The further requirement that the plaintiff be himself hurt is additional evidence that the grievance alleged is strongly felt and not merely factitious. On a deeper level, the Court's standing rules recognize a constitutional preference for solving social and political problems by con-

sent. *Warth v. Seldin, supra,* 422 U.S. at 500, 95 S.Ct. 2197; *United States v. Richardson, supra,* 418 U.S. at 188–89, 94 S.Ct. 2940 (Powell, J., concurring). Standing rules place the burden on the person seeking a non-majoritarian, court-imposed solution to demonstrate the need for judicial intervention.[2] These institutional interests in the avoidance of ephemeral litigation or collision with majoritarian decisions are the primary justification for standing rules.

A secondary justification for those rules is protection of the quality of the court's adjudication of constitutional issues. In theory, at least, both the requirement that the constitutional claim be presented by a party with a genuine stake in the action and the requirement that the complaint come from the mouth of the person who actually suffered the illegal injury assure that the court will obtain from the attorneys in the case a fuller and more accurate account of the considerations relevant to the decision than it would otherwise receive. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *see also, Singleton v. Wulff, supra,* 428 U.S. at 114, 96 S.Ct. 2868; *Schlesinger v. Reservists to Stop the War, supra,* 418 U.S. at 221, 94 S.Ct. 2925. In view of the relatively minor injuries which have been held to warrant a grant of standing, it may be doubted whether in most cases standing rules provide more than formal assurance of vigor in the litigation. Still, the concern that litigants may, by exaggeration or understatement, distort the interests of those not parties to the suit is a real and a continuing one.

 Of course, the court's inquiry into the costs of intervention, including the risk of a mistaken adjudication, is not conducted in a vacuum. A denial of standing, even to a less-than-ideal claimant, may also impose important costs. Thus, while standing

---

**2.** Because standing rules are so closely identified with the principle that unnecessary conflict with the majoritarian branches of government should be avoided, it would seem to follow that when those branches invite individual intervention through an express grant of standing, that grant should be recognized, with little concern for either Art. III or prudential barriers to justiciability. *Schlesinger v. Reservists to Stop the War, supra,* 418 U.S. at 224 n.14, 94 S.Ct. 2925 (citing cases).

should not depend upon the "merits of the plaintiff's contention that particular conduct is illegal," *Warth v. Seldin, supra,* 422 U.S. at 500, 95 S.Ct. at 2206; *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), it often implicates a court's belief that a grant of standing to challenge the asserted illegality is necessary or desirable in order to advance the constitutional or statutory policies at issue in the litigation. The Supreme Court has expressly acknowledged the relevance of substantive policy where the issue is the relaxation or reinforcement of prudential standing limitations. *Warth v. Seldin, supra,* 422 U.S. at 500, 95 S.Ct. 2197. In such cases, it has suggested, the question is whether "the constitutional or statutory provision in question implies a right of action in the plaintiff." *Id.* at 501, 95 S.Ct. at 2206. The same considerations must, we think, be considered in the definition of an Art. III case or controversy. Injury in fact, after all, is not mentioned in Art. III, and case or controversy is surely not a self-defining category. The definitional problem is, of course, minimal when a plaintiff alleges a substantial past physical or financial injury of a traditional sort. But where the injury is less tangible, the determination whether it merits Art. III recognition will necessarily turn on a court's view of the sensitivity of the constitutional values in dispute.

## III. FRISSELL'S STANDING

■ We turn then to the allegations made in Frissell's complaint. Since it was dismissed on the pleadings we must, and do, accept as true all material allegations of the complaint, and construe them in favor of the complaining party. *Warth v. Seldin, supra,* 422 U.S. at 501, 95 S.Ct. 2197; *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Contemplating those allegations, we think that an Article III injury to the Bulletin has been made out. The type of financial injury which resulted from the Mayor's withdrawal of funding is one with which courts have long been familiar. The injunction sought would redress that injury directly and forcefully, and no prudential consideration would bar the Bulletin from asserting its own injury. Moreover we assume, without deciding, that were the Bulletin to press a suit in its own behalf it could readily establish that its First Amendment rights have been violated. The chilling impact of money damages upon legitimate press activity protected by the First Amendment is a constitutional commonplace. *E. g., New York Times v. Sullivan,* 376 U.S. 254, 277, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). It is not hard to appreciate that the government's withdrawal of advertising from a newspaper would have a similar effect. Moreover, although the City's advertising program is claimed by the defendants to be within the discretionary authority of the Mayor, it seems to be settled, at least in the First Amendment area, that "the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected interests. . . .' " *Elrod v. Burns,* 427 U.S. 347, 359, 96 S.Ct. 2673, 2682, 49 L.Ed.2d 547 (1976) (plurality opinion), (*quoting Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)). The Mayor's withdrawal of advertising, if aimed, as alleged, at deterring legitimate press activity, probably would be construed as falling within this proscription. *See also Grosjean v. American Press Co.,* 297 U.S. 233, 250, 56 S.Ct. 444, 80 L.Ed. 660 (1935).

But while the Bulletin is well situated to press this claim, it has not yet seen fit to sue Mayor Rizzo or the City. And although the paper has apparently been aware of the instant lawsuit since it was filed more than six months ago, it has taken no steps to intervene or otherwise assert its own interests either in the district court or on appeal. Indeed, both Frissell and the defendants are in agreement that the Bulletin has throughout "taken no position" regarding the outcome of this lawsuit. Thus, we must consider whether, in the absence of any action by the Bulletin, Frissell is entitled to seek relief on the Bulletin's behalf. Frissell alleges two theories to support that entitlement: (1) that he is a member of the public with standing to protect "the free flow of

information in the Philadelphia community"; (2) that as a taxpayer he has standing under Pennsylvania and federal law to halt the illicit manipulation of government funding for objects violative of the First Amendment. We find both of these theories unpersuasive.

## A.

■ Frissell alleges that he has been injured because the effect of the withdrawal of advertising is "to chill and inhibit freedom of the press and freedom of association" in Philadelphia. He points out that the Supreme Court has recognized that the First Amendment protects "an uninhibited marketplace of ideas in which truth will ultimately prevail." Plaintiff's Brief at 7; see *Elrod v. Burns*, 427 U.S. 347, 357, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion); *Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting). But it does not follow that because the First Amendment protects widespread public debate, every member of the general public suffers injury whenever the First Amendment is violated in a manner that remotely tends to chill that debate. The consequence of such a rule would be to make virtually all First Amendment violations subject to instant legal challenge despite the absence of any concrete impingement upon the personal interests of the challenger. *Schlesinger v. Reservists to Stop the War, supra*, 418 U.S. 223, 94 S.Ct. 2925. Such an expansive definition of legally cognizable injury under the First Amendment strays too close to permitting standing to vindicate an abstract interest in the legality of government conduct, and we therefore reject it.

More persuasively, Frissell points to cases recognizing the First Amendment right of "hearers" to challenge restrictions placed upon persons whom they wish to hear. *E. g., Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council Inc.*, 425 U.S. 748, 756–57, 96 S.Ct. 1817, 48 L.Ed.2d

346 (1976); *Kleindienst v. Mandel*, 408 U.S. 753, 762–65, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972); *Lamont v. Postmaster General*, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965).[3] In all of these cases, persons whose access to information was barred by restraints upon the speaker were permitted to assert their own "right to hear" as a ground for invalidating those restraints.

■ We agree with Frissell that the rationale of these cases might, in an appropriate case, support the conclusion that a would-be hearer suffers Art. III injury from a monetary sanction aimed at deterring a speaker from communication protected by the First Amendment. The inhibiting effect of such sanctions is recognized. *New York Times v. Sullivan, supra*. Moreover, the concrete impact of a discrete sanction directed at a specific relationship differs fundamentally from the "subjective 'chill,'" resulting from the "mere existence" of a government program that was held insufficient to establish injury in fact in *Laird v. Tatum*, 408 U.S. 1, 13–14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). On the contrary, that impact would constitute a "specific present objective harm," *id.* at 14, 92 S.Ct. 2318, to a relationship protected under the First Amendment. For similar reasons, we doubt that the holding in *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), requiring the pleading of "but for" causation, would be applicable to a suit founded on a protected speaker-hearer relationship, even in those cases where plaintiff cannot demonstrate that the speaker has actually been prevented from speaking by the governmental sanction. The sensitive nature of First Amendment rights and the difficulty of obtaining proof of a causal connection might well render such an inquiry into the speaker's behavior wholly impracticable and undesirable. *Cf. Herbert v. Lando*, 568 F.2d 974, 984 (2d Cir. 1977), *cert. granted*, 435 U.S. 922, 98 S.Ct. 1483, 55 L.Ed.2d 515 (1978). In any event, we think a plaintiff who alleged such a chill

3. *See also Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (speakers permitted to rely on the rights of hearers); *Martin v. Struthers*, 319 U.S. 141, 143, 63 S.Ct. 862, 87 L.Ed. 1313 (1943) (dictum).

would be entitled, before his complaint was dismissed, to discovery for the purpose of determining whether the sanction in fact had an inhibiting impact.[4]

We need not decide this difficult issue, however, since for two reasons appellant's allegations do not bring him within the rationale of the right to hear cases. First, it is apparent that in those cases the hearer asserted an injury to an interest in a defined relationship with a specific speaker or speakers.[5] For example, in *Kleindienst v. Mandel, supra,* the hearers were American professors and writers who had invited Mandel, a noted Marxist intellectual, to speak in this country. Mandel had been excluded. In *Lamont,* plaintiffs were persons to whom Communist literature had been addressed from overseas. The Court found that the postal regulations in issue impeded their access to those publications. And in *Virginia State Board of Pharmacy, supra,* the hearers were consumers seeking to void Virginia's ban on price advertising for prescription drug advertising. The Supreme Court, sustaining their right to hear, specifically noted that the parties had stipulated that "some pharmacies" would publish

advertising in the absence of the prohibition. 425 U.S. at 756 n.14, 96 S.Ct. 1817.

The requirement that the hearer demonstrate injury to a relationship with an affected speaker is, we think, essential to avoid the kind of broad scale assertion of injury to an undifferentiated public interest that the appellant's initial theory of standing suggests. Exactly how well defined or intimate that relationship must be the cases do not make clear. The Court's willingness to accept the broad allegations of potential consumers in *Virginia State Board of Pharmacy, supra,* certainly indicates that a person who alleged that he was a regular reader of a newspaper might stand in such a relationship. *See also Lamont v. Postmaster General, supra.* But *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), implies that the right to hear might be limited to persons who have a "particularized interest" in communicating with the speaker or to "particular means of communication in which the interests of both [hearer and speaker] are inextricably meshed." *Id.* at 408–09, 94 S.Ct. at 1809. Under such a test, the standing of newspaper readers might well be in doubt. We need not fully resolve this issue, however,

4. *Paton v. LaPrade,* 524 F.2d 862, 873–74 (3d Cir. 1975), would not necessarily be controlling in the face of the allegations we suggest would be needed to support a grant of standing here. In *Paton* this court affirmed a district court's grant of summary judgment, rejecting the standing of a high school teacher who sought damages and injunctive relief against the FBI on account of an investigation by that agency of a student who had, during the course of research for a high school project, addressed a letter of inquiry to an asserted subversive organization. The teacher alleged that the FBI's action had infringed his right of academic freedom.

The *Paton* court rejected this claim as a basis for standing. The allegation, the court found "might be sufficient to confer standing" at the complaint stage. On the facts arrayed in support of the motion for summary judgment, however, the claim failed. These facts showed that the plaintiff did not teach the course at issue and was not responsible for the student's mailing of the letter. These admissions, the court said, made it "difficult to determine how he was directly injured by defendant's activities." Moreover, the teacher conceded that the FBI's activity had had no effect on his educational activities. The only factual injury assert-

ed against the motion for summary judgment was the "inhibiting force" of the FBI's activity. This "subjective chill," the court found, was so much like that described in *Laird v. Tatum, supra,* as to bar standing on that ground as well.

This case is distinguishable from *Paton* in two important respects. First, the case arises on a dismissal of the complaint, rather than a motion for summary judgment. The detailed assessment of the nature of the injury possible on the record in *Paton* therefore is not possible here, and we must construe the complaint in favor of the appellant. Second, in the *Paton* case the record affirmatively disclosed the absence of any relationship between the injured student and the teacher himself. The plaintiff's allegation was based, not on the harm to him flowing from the student's injury, but rather on the speculative possibility of future injury to other students.

5. In the closely analogous situation where a litigant is seeking to assert the constitutional rights of a third party, the Supreme Court has required that such a relationship be demonstrated. *E. g., Singleton v. Wulff, supra,* 428 U.S. at 114–15, 96 S.Ct. 2868.

since the appellant nowhere even alleges that he reads or subscribes to the Bulletin, or that the Bulletin, as distinct from the Philadelphia press generally, has, in fact, been silenced or even inhibited on any subject in which he was interested. In the absence of such allegations, his claim of personal injury is deficient.

 Even if we were to read Frissell's complaint as sufficiently alleging injury to a protected relationship with the Bulletin, however, the cases recognizing the right to hear suggest a second and more significant prudential reason why he may not be heard to assert that injury. As a matter of logic, the right to hear and the right to speak are "two sides of the same coin." Kleindienst v. Mandel, supra, 408 U.S. at 775, 92 S.Ct. at 2588 (Marshall, J., dissenting). The two rights are not, however, completely coequal: the right to hear flows from and depends upon the right to speak. Generally there can be no right to hear what a speaker does not choose to say.[6] In most cases, then, the speaker—not the hearer—will be in a better position both to identify and weigh precisely the injuries flowing from First Amendment restraints and to present them for judicial redress. This superior position suggests that the recognition of standing to assert the right to hear is fundamentally analogous to a grant of standing to assert the rights of a third party and ought, perhaps, to be governed by similar prudential restrictions, including the rule that one may claim standing to assert the rights of a third party only upon a showing that some "genuine obstacle" has prevented the third party's vindication of his own legal rights. Singleton v. Wulff, supra, 428 U.S. at 116, 96 S.Ct. 2868; NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). See also O'Malley v. Brierley, 477 F.2d 785, 788–89 (3d Cir. 1973). The assumption behind this rule is that, in the absence of a showing that such

an obstacle exists, the third party has presumably consented to, or does not view himself as injured by, the challenged state conduct. Singleton v. Wulff, 428 U.S. at 116, 96 S.Ct. 2868. In such cases, it may well be that the thrust or timing of, or choice of forum for, the action in which the rights of the third party are raised, conflicts importantly with the third party's underlying interest. This limitation on third party standing thus enforces a "best plaintiff" rule in order to avoid needless and perhaps counterproductive litigation. See 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3531 at 211 12 (1975).

The facts of this case illustrate that the risk of conflict of interest may be especially great when a hearer is granted standing to protect the First Amendment interests infringed by retaliation aimed at a speaker— particularly a newspaper speaker. The Bulletin is quite clearly the preferred plaintiff in this lawsuit. If it has suffered a direct and substantial financial injury, as a professional speaker it has both a powerful incentive to litigate illegal conduct in violation of its First Amendment rights, and considerable expertise in doing so. We must assume, in the absence of any allegation to the contrary, that the Bulletin's decision not to bring suit reflects a considered judgment as to its most advantageous course of action. To name only one possibility, the Bulletin may well have concluded that in the Philadelphia market its loss of City advertising marks it as a "crusading" paper, truly independent of the City's hierarchy, and thus increases its overall credibility and marketability. In contrast, a reader's suit is unlikely to be prosecuted with the full sophistication of a claim presented by the newspaper and often may not reflect the paper's judgment of its most profitable course of action. The risk of conflict between media and audience interest is enhanced by the fact that, as noted above, the newspaper-reader relationship is not so intimate as to

---

6. Cf. Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (reply statute violates freedom of the press); but cf. Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 389–92, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) (upholding FCC's fairness doctrine).

provide strong circumstantial guarantees of community of interest. There is perhaps a greater danger that plaintiffs may press such suits for short range personal or political, rather than long range institutional considerations. On the other hand, if it could be shown that the newspaper itself is somehow disabled or impeded from pressing its own claim, by fear of future reprisal or for other reasons, a court might be hard pressed to deny the claim of a reader to protect his own interest in the relationship, and indirectly, the newspaper's rights, as well.[7]

There is implicit support for approaching the right to hear as a problem of third party standing in the facts, if not the express reasoning, of the cases where the Supreme Court has recognized such a right. Thus in both *Kleindienst v. Mandel, supra,* and *Lamont v. Postmaster General, supra,* the potential speakers were foreign nationals living overseas, who were disabled from protecting the First Amendment interests at stake by broader general rules limiting their right to enter this country or to import materials into it. *See* 408 U.S. at 753, 92 S.Ct. 2576; 381 U.S. at 308, 85 S.Ct. 1493 (Brennan, J., concurring). In both cases, the only way that the underlying First Amendment interest could be effectively vindicated was by a grant of standing to the would be hearers. While in *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., supra,* no legal obstacle prevented pharmacists from vindicating their own First Amendment rights to advertise, the effect of the Board's restrictions on a price advertising was to create a pharmacists' cartel, sheltered from competition, which sharply reduced the incentive for any individual pharmacist to oppose the regulations. The grant of standing to consumers to challenge the advertising ban was, under the circumstances, an appropriate means to vindicate the First Amendment interests at stake. In sum, it appears to us that the cases where the Supreme Court has permitted a hearer to vindicate First Amendment interests are most appropriately viewed as instances where the "prudential considerations" which often bar the assertion of third party rights were overcome by a demonstrated obstacle to the speaker's vindication of First Amendment values which justified implication of a right of action in favor of the hearer. We therefore conclude that, even if Art. III injury has been shown in this case, since Frissell

---

7. This case is distinguishable from those where if the party before the court is not allowed to press the third party claim, the rights of third parties will be diluted. *See Carey v. Population Services International,* 431 U.S. 678, 683, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Craig v. Boren,* 429 U.S. 190, 192 97, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Eisenstadt v. Baird,* 405 U.S. 438, 443 446, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). In these cases, vendors of goods or services were permitted to assert the constitutional rights of potential vendees as a basis for the invalidation of restrictions on the distribution of their product, despite the absence of any indication that the customers were disabled from vindicating their own rights. The rationale for permitting that assertion was that in each instance the enforcement of the sale restriction against the person seeking to assert *jus tertii* would have indirectly burdened the potential purchaser's exercise of his constitutional rights. *See* Note, *Standing to Assert Constitutional Jus Tertii,* 88 Harv.L.Rev. 423, 431 34 (1974). The alleged constitutional deprivation to the Bulletin here is not an indirect consequence of any injury to the plaintiffs, but rather a cause of it. *Id.* at 434.

Moreover, in cases like *Craig* and *Carey,* the existence of the vendor-vendee relationship and the fact that the class of potential third party claimants was large suggested both that the vendor's representation was likely to be vigorous and well financed, *Craig v. Boren, supra,* 429 U.S. at 194, 97 S.Ct. 451, and that if the claim by the vendor were not recognized, a new, repetitious claim by at least one member of the vendee class would follow thereupon. *Id.*; 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3531 at 212 & Supp. at 41 (1978). In fact, the co-claimant in *Craig v. Boren,* whose suit was mooted prior to review in the Supreme Court, was a member of the class of vendees. In the situation before us, however, these considerations cut in favor of denying standing. There is here real danger that a newspaper reader will not adequately represent the Bulletin's interest. Moreover, if the plaintiff is not allowed to sue, it is possible that no claim will ever reach federal court, and if such a claim is presented it is likely to differ significantly from that presented by this claimant.

has suggested no "genuine obstacle" which bars the Bulletin from bringing suit in its own right, his standing to vindicate that right should be denied.

## B.

Frissell also argues that he has standing as a municipal taxpayer to challenge the Mayor's action. He points out, correctly, that Pennsylvania has recognized the standing of municipal taxpayers to challenge unlawful expenditure of government funds. *E. g., Price v. Philadelphia Parking Auth.*, 422 Pa. 317, 221 A.2d 138 (1966); *Loewen v. Shapiro*, 389 Pa. 610, 133 A.2d 525 (1957). Since the Mayor's withdrawal of advertising involves a diversion of city funds alleged to violate the First Amendment,[8] he argues, he has standing to halt that withdrawal.

Even if Frissell could claim standing under state law, we do not think that would help him in this suit, since it was brought in a federal trial court. There has been considerable dispute whether standing to raise a federal question in *state* court is a matter of federal or state law. *See Flast v. Cohen*, 392 U.S. 83, 132 n.22, 88 S.Ct. 1942, 20 L.Ed.2d 947 (Harlan, J., dissenting) (federal); Freund, in E. Cahn, Supreme Court and Supreme Law 35 (1954) (federal); *contra*, G. Gunther, Constitutional Law 1573–74 (9th ed. 1975). On direct review the Supreme Court has on occasion considered, although not without dispute, the merits of cases in which standing was based on state law rules. *Everson v. Bd. of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); *Bradfield v. Roberts*, 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168 (1899); *cf. Richardson v. Ramirez*, 418 U.S. 24, 36–40, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974) (mootness). *But see*

*Doremus v. Bd. of Education*, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952); *Tileston v. Ullman*, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943). In a federal trial court, however, standing to sue is determined by federal law. *Baker v. Carr, supra*, 369 U.S. at 204, 82 S.Ct. 691.

Petitioner's reliance on *Flast v. Cohen*, 392 U.S. 83 (1968), as the source of a federal law taxpayer cause of action is misplaced. *Flast*, it is true, permits state or municipal taxpayer suits in federal court, e. g., *Public Funds for Public Schools v. Byrne*, 590 F.2d 514 at 516 n.3 (3d Cir. 1979), but only to challenge expenditures in violation of those constitutional provisions which are recognized as specific limitations upon state power to tax and spend. Assuming *arguendo* that the plaintiff could show an expenditure—and hence injury—in this case, he has alleged no conduct in violation of a specific constitutional limitation on the spending power. *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974), makes this clear. In *Richardson* the plaintiffs contended that those provisions of the Central Intelligence Act which provided that CIA expenditures were not to be made public violated the constitutional requirement that Congress publish a regular statement and account. Art. I, § 9, cl. 7. A requirement of a regular statement of expenditures would appear to be a relatively specific limitation upon the government's exercise of the spending power. The Supreme Court, however, held otherwise. 418 U.S. at 175, 94 S.Ct. 2940. In the wake of the *Richardson* holding the claim that the general First Amendment guarantees of free press and free speech fall within the class of specific limitations satisfying the *Flast* test is without merit.[9] In the absence

---

8. It is unclear whether the City's diversion to other, legal uses of funds withheld from the Bulletin is the type of unlawful or potentially unlawful commitment of government resources required to support taxpayer standing under Pennsylvania law, since it would not create a risk of increased city taxes. *Price v. Philadelphia Parking Auth., supra*, and *Loewen v. Shapiro, supra*, both suggest that some risk of increased taxation is required.

9. Moreover, a central, if unarticulated justification for the grant of taxpayer standing in *Flast* was the feared lack of other suitable claimants capable of raising the Establishment Clause claim against expenditures for non-public education. See *United States v. Richardson, supra*, 418 U.S. at 195 n.17, 94 S.Ct. 2940 (Powell, J., concurring); 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3531 at 195 (1975). That rationale is not available here.

of an alternate source of taxpayer standing appellant's claim was properly denied.

## IV. CONCLUSION

 Where, as here, a plaintiff seeks relief for the violation of First Amendment rights of a newspaper, and the complaint fails to allege either that the newspaper has actually been inhibited in its reporting of the news, thus injuring its readers' right to hear, or that it is in some manner inhibited from asserting its own First Amendment rights, we hold that the complaint may be dismissed for failure to state a claim upon which relief can be granted. The judgment of the district court will be affirmed.