James **HETHERTON** and Carol Hetherton, his wife, Appellants,

v.

**SEARS, ROEBUCK & COMPANY**, a New York corporation, Appellee.

No. 80–2126.

United States Court of Appeals, Third Circuit.

Argued Jan. 15, 1981.

Decided June 25, 1981.

---

Carl A. Agostini, Wilmington, Del., for appellants.

Arnold J. Bennett (argued), Robert F. Maxwell, St. Davids, Pa., Howard Berg, Berg, Heckler & Cattie, P. A., Wilmington, Del., for appellee.

Before WEIS and HIGGINBOTHAM, Circuit Judges, and McCUNE, District Judge.*

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

This case comes before us for the second time and raises questions of standing and the constitutionality of a Delaware statute requiring each purchaser of a "deadly weapon" to be identified by two freeholders.[1] Del.Code Ann. tit. 24, § 904 (Michie 1975). In Hetherton v. Sears, Roebuck & Co., 593 F.2d 526 (3d Cir. 1979), we reversed the judgment of the district court granting Sears' motion for summary judgment and remanded the case for consideration of the issues of proximate cause and damages. Sears, as a vendor of deadly weapons, had

sold Lloyd Fullman, Jr., a rifle and ammunition in violation of § 904.[2] Fullman used the weapon and ammunition in an attempted robbery of a Wilmington restaurant where James Hetherton was employed as a guard. During the course of the robbery, Fullman shot Hetherton in the head, severely wounding him. Hetherton sued Sears alleging that Sears was negligent for selling the weapons to Fullman without requiring that he be identified by two freeholders.

Sears raised, though somewhat obliquely, the federal constitutional issue now before us in its original answer to Hetherton's complaint.[3] Since, in the first district court opinion of January 27, 1978, Sears received a summary judgment on the ground that there was neither statutory nor common law liability, the trial court did not reach the constitutional issues asserted in the original answer. Hetherton v. Sears, Roebuck & Co., 445 F.Supp. 294 (D.Del.1978). Similarly, when the matter was before us on the first appeal, the federal constitutional issues were not briefed or argued. On remand the constitutional question was reached. Thus, the issue now properly before us is Sears' challenge to the constitutionality of § 904's freeholder identification requirement on equal protection grounds. It alleged that § 904 was without rational basis because it "denied the class of people not possessing freehold estates the opportunity to participate in the enforcement of the statute and it denied the class of people who did not know any freeholders the privilege of purchasing arms." District Court Opinion, reprinted at A-3. Hetherton responded that Sears lacked standing to chal-

---

* The Honorable Barron P. McCune, United States District Court for the Western District of Pennsylvania, sitting by designation.

1. The statute does not define the term freeholder but the term is generally understood to mean one who is the owner of real property. Gebelein v. Nashold, Del.Ch., 406 A.2d 279 (1979); See 28 Am.Jur.2d Estates § 8 (1966).

2. At the time in question, § 904 required that "2 freeholders resident in the county wherein the sale is made" shall positively identify any purchaser of a deadly weapon. Fullman pro-

duced a Delaware driver's license with his picture on it and completed a Federal Firearms Transaction Record, Form 4473, when he purchased the rifle and ammunition. He did not, however, produce two Delaware freeholders for the purpose of positively identifying him. Subsequent to the sale in this case, Delaware amended § 904 to require identification by "at least 2 residents of the State." Del.Code Ann. tit. 24, § 904 (Michie Supp.1980).

3. See paragraph 15 of Sears' answer to Hetherton's complaint at A-2.

lenge the constitutionality of § 904 and that, even if such a challenge were permissible by Sears, § 904 was supported by a rational basis.

In an excellent opinion by Judge Latchum, who was assigned the case after our remand, the contentions of Hetherton were rejected. We affirm Judge Latchum's decision and agree that Sears has standing to challenge the constitutionality of § 904 and that § 904, as it existed when the underlying events occurred, violates the fourteenth amendment.

## I.

### STANDING TO CHALLENGE THE CONSTITUTIONALITY OF § 904

The jurisdiction of federal courts is limited by Article III of the United States Constitution to "cases" or "controversies." *Flast v. Cohen*, 392 U.S. 83, 94, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 (1968); *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). A means of insuring valid jurisdiction is to require that parties coming to the federal courts have standing to present the claims they seek to have adjudicated. As the Supreme Court wrote in *Flast v. Cohen*, 392 U.S. at 99–100, 88 S.Ct. at 1952–1953 (footnotes omitted) (emphasis added):

> The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated. *The "gist of the question of standing" is whether the party seeking relief has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." Baker v. Carr*, 369 U.S. 186, 204, [82 S.Ct. 691, 703, 7 L.Ed.2d 663] (1962). In other words, when standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable. Thus, a party may have standing in a

particular case, but the federal court may nevertheless decline to pass on the merits of the case because, for example, it presents a political question. A proper party is demanded so that federal courts will not be asked to decide "ill-defined controversies over constitutional issues," *United Public Works of America v. Mitchell*, 330 U.S. 75, 90, [67 S.Ct. 556, 564, 91 L.Ed. 754] (1947), or a case which is of "a hypothetical or abstract character," *Aetna Life Insurance Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240, [57 S.Ct. 461, 463, 81 L.Ed. 617] (1937). So stated, the standing requirement is closely related to, although more general than, the rule that federal courts will not entertain friendly suits, *Chicago & Grand Truck R. Co. v. Wellman, supra*, [143 U.S. 339, 12 S.Ct. 400, 36 L.Ed. 176] or those which are feigned or collusive in nature, *United States v. Johnson*, 319 U.S. 302, [63 S.Ct. 1075, 87 L.Ed. 1413] (1943); *Lord v. Veazie*, 8 How. 251, [12 L.Ed. 1067] (1850).

In *Association of Data Processing Service Org., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829–830, 25 L.Ed.2d 184 (1970) and *Barlow v. Collins*, 397 U.S. 159, 163, 90 S.Ct. 832, 835, 25 L.Ed.2d 192 (1970), the Supreme Court sharpened the analysis of *Flast* and *Baker*. It noted that parties have standing if they have suffered " 'injury in fact, economic or otherwise,' to an interest 'arguably within the zone of interest to be protected or regulated by the statute . . . in question.' " *Americans United for Separation of Church and State, Inc. v. HEW*, 619 F.2d 252, 256 (3d Cir. 1980), *cert. granted sub nom., Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 450 U.S. 909, 101 S.Ct. 1345, 67 L.Ed.2d 332 (1981), *quoting, Data Processing Service*, 397 U.S. at 152–53, 90 S.Ct. at 829–830. *See United States of America v. Westinghouse Electric Corp.*, 638 F.2d 570 (3d Cir. 1980).

■ There is little question that Sears risks suffering injury in fact to an interest arguably within the zone of interest to be regulated by § 904. As the district court wrote:

The statutory requirement which Sears is challenging here created for Sears a legal duty to require anyone purchasing a firearm from Sears to produce two freeholders who could identify the purchaser. Sears' failure to perform this duty is presently exposing it to a very large potential liability and could lead to criminal prosecution. Thus, the statute is clearly causing Sears injury in fact and Sears had a weighty personal interest in demonstrating that the law was unconstitutional.

District Court Opinion at A–3.[4] The existence of potential civil and criminal liability when combined with the statute's clear intention to regulate the vendors of deadly weapons assures us that Sears had presented the "concrete adverseness" envisioned by *Flast* and *Baker.*

■ The dissent bases its objection to granting standing to Sears on "prudential" grounds. The term "prudential" is hazy in meaning and has seldom been defined with precision by the Supreme Court. Apparently it means "dimensions ... founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin,* 425 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Prudential considerations however do not dictate that we deny Sears standing in this case. Typically courts will not permit a party to assert third party rights vicariously where the third party is capable of representing their own interests. This is due to a belief that the third party, whose rights have been violated, will have a clearer and more aggressive interest in seeing the rights vindicated. Here, Sears seeks to represent the interests of non-freeholders to participate in the enforcement of the Dela-

ware statute and of persons who do not know any freeholders and want to purchase deadly weapons.[5] We have concluded that any prudential considerations are outweighed by Sears' vital and immediate interests in challenging § 904.

The dissent argues that the prudential basis for denying standing to Sears is made stronger by the fact that the amendment to § 904 makes the irrational distinction between freeholders and non-freeholders moot. It is true that Sears' challenge will not benefit any Delaware citizens in the future. Nevertheless, Sears was required to operate under what we believe was an unconstitutional statute and to risk criminal and civil liability for failing to follow it. The concern expressed by the Supreme Court in *Craig* that a vendor not be forced to chose between perpetuating discrimination and risking liability was present here even though the statute has since been amended. Furthermore, the cases where prudential concerns have been asserted to deny standing involve situations totally separate from the present case. For example, standing has been denied in cases involving an injury too abstract or general in nature, *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 220–23, 94 S.Ct. 2925, 2932–2933, 41 L.Ed.2d 706 (1974), or cases calling for the resolution of political questions, *Flast v. Cohen,* 392 U.S. at 100, 88 S.Ct. at 1952. If Sears has standing under *Craig* as a vendor to whom an unconstitutional statute was directed, then the later amendment of that statute should not be given a retroactive effect so as to bar Sears from asserting the same constitutional arguments it could validly have made had the statute not been amended. Sears' liability, if any, arises because of its acts on the day the sale

---

4. Section 905 provides a criminal sanction of a fine up to $100, a prison sentence of not more than 6 months, or both for violating § 904. Del.Code Ann. tit. 24, § 905 (footnote in original).

5. Presumably, if the regulations were more lax, sales would increase and Sears could assert a direct interest in the statute's unconstitutionality. However, in our earlier *Hetherton* opinion, we concluded that one of the purposes of § 904

was to make weapons purchases more difficult. Whether Fullman, who was Sears' vendee in the present case, knew any Delaware freeholders is not clear from the record. This fact notwithstanding, Sears could represent potential vendees, who have been discriminated against because they knew no freeholders, as the vendor in *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) was permitted to do.

was made and it should have the same right on the basis of *jus tertii* to challenge § 904 as it would have had had there been no amendment.

The policies enunciated in *Craig* and our court's decision in *Westinghouse Electric* support this conclusion. The Supreme Court in *Craig* permitted a beer vendor to challenge the constitutionality of an Oklahoma statute that discriminated between men and women in the purchase of 3.2% beer. The rationale for their decision was that the vendor had "vigorously and 'cogently'" presented the constitutional issues and, if standing were denied, vendors would be deterred from selling the beer to members of the class, thereby perpetuating the discrimination. *Craig v. Boren*, 429 U.S. at 194–95, 97 S.Ct. at 455–456. The Court went on to emphasize that the statute was directed towards the vendor forcing her to either perpetuate the discrimination or risk criminal sanctions. Thus, "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Id.* at 195, 97 S.Ct. at 456 (citations omitted).

Similarly, in *Westinghouse Electric*, our court permitted Westinghouse to challenge a subpoena directed towards it seeking the production of employees' medical records. Judge Sloviter, writing for the majority, noted that Westinghouse could be subjected to a contempt sanction for failure to comply with the subpoena. Since Westinghouse was effectively in the best position to present the privacy arguments of its employees, there was no prudential basis for the denial of standing.

We believe that the policies underlying the grant of standing in both *Craig* and *Westinghouse Electric* are directly applicable to Sears. The principal factor present in *Craig, Westinghouse Electric* and the instant case is that the party seeking to assert third party rights was subject to sanc-

tion for failure to obey either an unconstitutional statute or an impermissible subpoena. Sears is in the best position to cogently present the constitutional arguments and there is no suggestion that they have done otherwise. We, therefore, affirm the district court's holding that Sears has standing to assert the constitutional rights of non-freeholders in the State of Delaware.

## II.

### THE CONSTITUTIONALITY OF § 904

■ Much has been written about the level of scrutiny a federal court should apply when reviewing a challenge to the constitutionality of a state statute or other official action. At the outset, it must be noted that this case involves neither a suspect classification nor a fundamental right. Thus, strict scrutiny is not appropriate. A strong argument could be made for the proposition that classifications based on the ownership of land are "quasi-suspect" and, therefore, receive a level of scrutiny greater than the rational basis test but less than strict.[6] We need not decide this issue because we agree with the district court's conclusion that under the lowest level of scrutiny § 904 does not pass constitutional muster.

The essence of Sears' argument is that the § 904 requirement of two freeholder witnesses to the sale of a deadly weapon bears no rational basis to Delaware's legitimate interest in having purchasers positively identified and in deterring ex-felons, such as Fullman, who are not permitted to purchase firearms in Delaware, from buying guns. Hetherton counters that, since Delaware can totally ban the sale of firearms, non-freeholders are not being deprived of a right. Further, he contends the two freeholder requirement is rational in that it results in a more burdensome procedure for the purchase of weapons.

■ Hetherton's argument that Delaware has created no right to purchase firearms is misconceived. While it may be true that Delaware could ban the sale of all

6. For an excellent treatment of the various constitutional standards in the fourteenth amendment area, see Judge Adams' recent opinion in

*Delaware River Basin Commission v. Bucks County Water & Sewer Authority*, 641 F.2d 1087 at 1091–1092, 1093 (3d Cir. 1981).

deadly weapons, it does not follow that the State, having abrogated its power to effect a total ban, can arbitrarily establish categories of persons who can or cannot buy the weapons. Clearly, Delaware could not limit the sale of firearms to men only or to members of certain religious groups. The question then is whether it is rational for Delaware to limit sales to persons who know two Delaware freeholders and can produce them as witnesses. We think that this question must be answered in the negative.

The Supreme Court has consistently looked askance at classifications based on the ownership of land. In *Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1969), the appellants, Black residents of Taliaferro County, Georgia, challenged, *inter alia*, a provision of a Georgia statute which limited school board membership to freeholders. The appellants argued that the Supreme Court's decisions in *Kramer v. Union Free School District*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (holding unconstitutional a New York statute which limited the right to vote in school district elections to persons who owned or leased taxable real property within the district or were parents or guardians of children enrolled in the local public schools) and *Cipriano v. City of Houma*, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969) (holding unconstitutional a Louisiana statute which granted the right to vote in revenue bond elections exclusively to property taxpayers), required Georgia to meet the compelling state interest test. The Court did not decide this argument, finding instead that "the Georgia freeholder requirement must fall even when measured by the traditional test for a denial of equal protection: whether the challenged classification rests on grounds wholly irrelevant to the achievement of a valid state objective." 396 U.S. at 362, 90 S.Ct. at 541, *citing McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) and *Kotch v. Board of River Pilot Commissioners*, 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093 (1947).

The Court's analysis of Georgia's interest in a freeholder requirement is directly relevant to the case at hand:

If we take Georgia at its word, it is difficult to conceive of any rational state interest underlying its requirement. But even absent Georgia's own indication of the insubstantiality of its interest in preserving the freeholder requirement, it seems impossible to discern any interest the qualification can serve. It cannot be seriously urged that a citizen in all other respects qualified to sit on a school board must also own real property if he is to participate responsibly in educational decisions, without regard to whether he is a parent with children in the local schools, a lessee who effectively pays the property taxes of his lessor as part of his rent, or a state and federal taxpayer contributing to the approximately 85% of the Taliaferro County annual school budget derived from sources other than the board of education's own levy on real property.

Nor does the lack of ownership of realty establish a lack of attachment to the community and its educational values. However reasonable the assumption that those who own realty do possess such an attachment, Georgia may not rationally presume that that quality is necessarily wanting in all citizens of the county whose estates are less than freehold. Whatever objectives Georgia seeks to obtain by its "freeholder" requirement must be secured, in this instance at least, by means more finely tailored to achieve the desired goal.

396 U.S. at 363–64, 90 S.Ct. at 542 (footnotes omitted).

█ It is clear to this court that Delaware's freeholder identification requirement is as anachronistic as the one in *Fouche*. As the lower court observed, many very responsible citizens in Delaware do not own property. Renting has become increasingly more popular and even necessary as the cost of real estate has grown prohibitive, particularly in urban areas, for the average wage earner. For Delaware to assume that only citizens with the wealth and/or interest in owning real property are capable of participating in the regulatory functions of § 904 is simply not rational. A

leaseholder is fully qualified to provide the needed identification and is capable of possessing the same "attachment to the community" as a freeholder. We therefore reject Hetherton's contention that the "right" of non-freeholders to serve as witnesses to the character of firearms purchasers is not unconstitutionally infringed upon by § 904. We find the same irrationality present in the fact that Delaware residents who know only leaseholders would be barred by § 904 from lawfully purchasing weapons.

Similarly, the argument that the freeholder requirement makes the buying of deadly weapons more burdensome does not meet the test of rationality. The state may have an interest in restricting the sale of firearms; however, it cannot do so by creating irrational and unconstitutional classifications. As noted earlier, there is no rational basis to conclude that a freeholder would take the responsibility of identifying weapons purchasers more seriously than a leaseholder. If Delaware desired to burden the sale of firearms by restricting them to persons who are non-felons or otherwise stable members of the community, it should have done so by a more narrowly tailored statute.[7] We cannot analyze the issue with more precision than Judge Latchum did when he perceptively noted:

> The only two conceivable interests which the freeholder identification requirement might serve were focused upon as noted earlier by the Court of Appeals. The Court there held that the requirement served both as a means of positive identification and as a means of deterring those who are not eligible to buy firearms, such as felons, from doing so. *Hetherton v. Sears, Roebuck & Co., supra* at 530–531. While these two objectives are certainly legitimate, the requirement that the identification be performed exclusively by freeholders bears absolutely no rational relationship to their achievement in these modern times.
>
> There is certainly no indication that holders of real property would offer a more positive or reliable means of identification of a firearm purchaser than would non-freeholders or even the driver's license carrying the purchaser's photograph that was actually tendered to Sears in this case. Similarly, there is no reason to believe that freeholders would be more likely than non-freeholders to deter the sale of firearms to felons or members of those classes who are ineligible to purchase them.
>
> If the identification requirement does deter such sales to felons, it could do so in one of two ways. First, it could make it more difficult for felons to purchase firearms because people are unlikely to agree to identify either an unknown person or one they know to be a felon and thus it would be difficult for a felon to find two people who would identify him. However, there is no reason to believe that freeholders are more likely to refuse to identify a firearm purchaser who is either a stranger or felon than are non-freeholders.
>
> Secondly, the identification requirement could also make it more difficult for felons to purchase firearms because where people are asked by felons or strangers to identify them, they may refuse and then report that fact to authorities. There is absolutely no reason to believe that non-freeholders are less likely than freeholders to report to the authorities that a felon or other suspicious person is seeking to purchase a firearm. In short, the Court finds no reason to believe that non-freeholders will be less willing than freeholders to attempt to protect their communities by helping to prevent those who should not possess firearms from purchasing them.

District Court Opinion at A–12–13.

### III.

### CONCLUSION

We are not unmindful of the serious injury which the plaintiffs have sustained and

---

**7.** The amendment to § 904 which now requires only identification by "two residents of the State," seems to reflect an awareness of the outmoded assumptions surrounding real property ownership. Of course, the amended § 904 is not before us and we express no view as to its constitutionality.

we are aware of the prophetic warning which the late Senator Kennedy gave as to the perils of the easy accessibility to handguns, which statement was made less than one year before his life was snuffed out by a handgun:

> We have a responsibility to the victims of crime and violence. . . . It is a responsibility to put away childish things—to make the possession and use of firearms a matter undertaken only by serious people who will use them with the restraint and maturity that their dangerous nature deserves—and demands.

Firearms and Violence in American Life; Staff Report to the National Commission of the Causes and Prevention of Violence, Vol. 7 at v.[8]

As a deterrent to our nation's escalating violence, certainly a legislature may prohibit the sale of handguns to individuals who have records such as Fullman and certainly they can impose substantial civil liability on gun sellers like Sears who breach the statutory obligations. But the legislature cannot use an unconstitutional means for even desirable and permissible goals. The "requirement must be secured by means more finely tailored to achieve the desired goal." *Turner v. Fouche*, 396 U.S. at 364, 90 S.Ct. at 542. To limit the options of prospective purchasers for guns to a requirement that only people who own real estate can identify the purchasers is no more constitutionally permissible than a requirement that only Catholics or Blacks or Indians can identify purchasers of handguns. Thus, though Sears may have avoided legal liability here because of a technical deficiency in the statute, the human and moral issues raised by this case are deeply troubling and the issue of gun control is one certainly appropriate for further legislative inquiry and correction.

For the foregoing reasons the June 17, 1980 opinion and order of the district court will be affirmed.

WEIS, Circuit Judge, dissenting.

As the majority explains, this appeal is yet another in the lengthening list of those presenting the often perplexing problem of standing—in its dual aspects, "constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The constitutional requirement is the ever-present one of case or controversy. The prudential consideration here is whether, in defending against the plaintiffs' claim, Sears should be allowed to interpose the rights of third parties.

The constitutional dimension of standing requires that a litigant who challenges the constitutionality of a statute demonstrate that he suffers some threatened or actual injury from its operation. I agree with the majority that because Sears is exposed to potential civil and criminal liability, that aspect has been shown. When a litigant "asserts the rights of third parties defensively, as a bar to judgment against him, . . . there is no Art. III standing problem." *Warth v. Seldin*, 422 U.S. at 500, n.12, 95 S.Ct. at 2206 n.12.

The second aspect of standing is more troublesome, however, and requires us to address "the further and less easily defined inquiry of whether it is prudent to proceed to decision on particular issues even at the instance of a party whose Art. III standing is clear." *Singleton v. Wulff*, 428 U.S. 106, 123, 96 S.Ct. 2868, 2878, 49 L.Ed.2d 826 (1976) (Powell, J., dissenting). The general rule is that "[o]rdinarily, one may not claim standing . . . to vindicate the constitutional rights of some third party." *Barrows v. Jackson*, 346 U.S. 249, 255, 73 S.Ct. 1031,

---

**8.** In a similar vein, Dr. Martin Luther King, Jr. noted:

> By . . . our readiness to allow arms to be purchased at will and fired at whim; by allowing our movie and television screens to teach our children that the hero is one who masters the art of shooting and the technique

> of killing . . . we have created an atmosphere in which violence and hatred have become popular pastimes.

Firearms and Violence in American Life; Staff Report to the National Commission of the Causes and Prevention of Violence, Vol. 7 at v.

1034, 97 L.Ed. 1586 (1953). This is a self-imposed, nonconstitutional limitation, founded on prudential considerations designed to minimize unwarranted intervention in controversies where constitutional questions are nebulous and speculative. *Craig v. Boren,* 429 U.S. 190, 193, 97 S.Ct. 451, 454, 50 L.Ed.2d 397 (1976).

The Court has articulated other justifications for the rule. "There are good and sufficient reasons for this prudential limitation on standing when rights of third parties are implicated—the avoidance of adjudication of rights which those not before the Court may not wish to assert, and the assurance that the most effective advocate of the rights at issue is present to champion them." *Duke Power Co. v. Caroline Environmental Study Group, Inc.,* 438 U.S. 59, 80, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1958). *See* L. Tribe, American Constitutional Law § 3–22, at 99 (1978); Note, *Standing To Assert Constitutional* Jus Tertii, 88 Harv.L.Rev. 423 (1974).

Although the reasons for restricting third-party standing are weighty, a few well-defined exclusions from the rule have been recognized. *See United States v. Raines,* 362 U.S. 17, 22, 80 S.Ct. 519, 523, 4 L.Ed.2d 524 (1960). They may be grouped under three headings: (1) the existence of countervailing considerations, such as the impossibility or difficulty attending third parties' efforts to assert their rights; (2) the lack of justification for enforcing the rule, as is true when there is such a congruence of interest between the third parties' rights and those of the proponent that they are tightly interwoven; and (3) the need to vindicate broad constitutional policy, for example, when fundamental rights are at stake.

A combination of facts in each of these categories has led the Court on frequent occasions to relax the rule against surrogate standing and permit litigants to vindicate third-party rights. These elements often occur in combination and are not always clearly separable. Their relative importance in the factual context of a case and the weight to be accorded each are matters that make standing "one of 'the most amorphous [concepts] in the entire domain of public law.'" *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968).

One factor does appear to be a constant, however. In cases where the Court has permitted surrogate standing, denial would have diluted or adversely affected third-party rights. There is no possibility of that occurring here because the challenged portion of the statute has been repealed. Although this is not an absolute determinant, it is a factor worthy of some consideration together with those more generally applied. I have some difficulty accepting the proposition that in the circumstance of this case the court should adjudicate a constitutional right at Sears behest on behalf of classes no longer affected.

The district court specifically limited its decision to the alleged right of nonfreeholders to participate in the gun regulatory procedures and did not discuss the merits of Sears claim to be the surrogate for an amorphous group of vendees who did not know two freeholders. *See Hetherton v. Sears, Roebuck & Co.,* 493 F.Supp. 82, 85 n.3 (D.Del.1980). Although the majority opinion considers both approaches, I specifically address only the issue raised by the district court.[1] In terms of the traditional tests,

---

1. Even though it has not been shown that Fullman, the purchaser, was unacquainted with freeholders, the majority concludes that "Sears could represent potential vendees, who have been discriminated against because they knew no freeholders, as the vendor in *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), was permitted to do." But in *Craig,* the Court said, "These prudential objectives, thought to be enhanced by restrictions on third-party standing, cannot be furthered here,

where the lower court already has entertained the relevant constitutional challenge and the parties have sought—or at least never resisted—an authoritative constitutional determination." 429 U.S. 193, 97 S.Ct. 455. In the case at hand, the plaintiffs have continually resisted an authoritative constitutional determination. Furthermore, the district court specifically declined to "reach the question of whether those unacquainted with any freeholder could be considered a discrete class of individuals for pur-

none of the exceptions to the rule against third-party standing are present here.

## I.

The first category, countervailing considerations, applies when third parties would have great difficulty presenting their own position, so the only effective way the asserted right may be presented is to confer standing on the proponent. An example is the problem that occurs when attempted vindication by the rightholders themselves would destroy the very right claimed. Thus, in *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), a state court attempted to secure the Association's membership list despite a challenge that the action violated the rights of those who belonged to the organization. The Court found that the NAACP had standing to litigate the constitutional right of its members, because "[t]o require that it be claimed by the members themselves would result in nullification of the right at the very moment of its assertion." *Id.* at 459, 78 S.Ct. at 1170.

In other circumstances, denial to the third party of a readily accessible forum in which the right may be asserted calls for the grant of standing. Thus, in *Barrows v. Jackson,* a white landowner who was sued for violating a racially restrictive covenant in a deed was allowed to vindicate the rights of black purchasers. Standing was permitted because it was unlikely that the buyers would have an opportunity to litigate the issue. *See Singleton v. Wulff,* 428 U.S. at 116 & n.6, 126–27 & n.4, 96 S.Ct. at 2875 n.6, 2880 n.4; L. Tribe, American Constitutional Law § 3–26, at 103–04 (1978). The *Barrows* case is also an example of overlapping exceptions, because there fundamental rights were at stake. *Accord, NAACP v. Alabama ex rel. Patterson.*

In *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), and *Craig v. Boren,* vendors were permitted to advance the rights of potential vendees. In both instances, the vendor was the "obvious claimant," the "least awkward challenger," *Craig v. Boren,* 429 U.S. at 196–97, 97 S.Ct. at 456–457, because the statute prohibited not use, but distribution. Thus, in a prosecution for distribution, the vendor had a forum, but because use of the same product was not a criminal offense, a similar opportunity was not available to third parties. Additionally, in these cases enforcement of the statute against the litigant directly violated the rights of the third parties.

In the matter at hand, the district court reasoned that only a litigant in Sears' position would have the incentive or inclination to assert the rights of nonfreeholders, since "the interest which is at stake is not of the kind that realistically could be expected to induce a rightholder to undertake the time and expense which litigation entails." 493 F.Supp. at 87. I am not persuaded that Sears' pecuniary interest in having the statute struck down and the nonfreeholders' lack of concern are enough to surmount the prudential limits on standing. Nor is the

---

poses of review under the Equal Protection Clause," 493 F.Supp. at 85 n.3, *citing San Antonio School District v. Rodriguez,* 411 U.S. 1, 17–29, 93 S.Ct. 1278, 1288–1294, 36 L.Ed.2d 16 (1973). It may be that in peeking down the road the district court saw serious difficulty in sustaining this constitutional challenge, when it seems clear that an even more restrictive regulation would pass muster.

I recognize that as an alternative basis for its holding, the Court in *Craig* found the requirements for surrogate standing met because "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." 429 U.S. at 195, 97 S.Ct. at 456. Here, however, Sears' practice of accepting a driver's license as the only method of identifying purchasers demonstrates that it was not acting as an advocate for potential vendees unacquainted with freeholders. *Cf. Eisenstadt v. Baird,* 405 U.S. 438, 445, 92 S.Ct. 1029, 1034, 31 L.Ed.2d 349 (1972), where the Court allowed the assertion of third-party rights because the relationship between the rightholders and the party asserting their rights was "not simply that between a distributor and potential distributees," but that between the third parties and "an advocate" of their rights. Moreover, in both *Craig* and *United States v. Westinghouse Electric Corp.,* 638 F.2d 570 (3d Cir. 1980), traditional exceptions to the rule against surrogate standing rule were present. That is not so here.

cost of litigation to the third parties a sufficient justification for avoiding the general rule.

There is nothing that would have prevented nonfreeholders, had they been so inclined, from challenging the validity of the statute before it was amended. The remedy of declaratory judgment and a forum were available to them. The fact that no action was taken has some significance, because, as the Supreme Court has stated, in general there is no need to adjudicate constitutional issues for those who may not care to have them determined. It is only when "there is some genuine obstacle to such assertion ... [that] the third party's absence from court loses its tendency to suggest that his right is not truly at stake, or truly important to him, and the party who is in court becomes by default the right's best available proponent." *Singleton v. Wulff*, 428 U.S. at 116, 96 S.Ct. at 2875.

Theoretical vindication of the nonfreeholders' rights as of 1976, when the ammunition was purchased, is not a matter that cries out for resolution by overburdened courts. This case is far removed from *NAACP v. Alabama, ex rel. Patterson*, where resort to a forum was simply unrealistic. The opinion of the Court in *Singleton* suggests that the obstacle requirement may be relaxed where the third party's individual claim is imminently moot, as the pregnant woman's was there, and as Craig's was in *Craig v. Boren*. *See* 428 U.S. at 118–19 n.7, 96 S.Ct. at 2876–2877 n.7. That factor, however, is not present here, and consequently, the first category does not apply.

## II.

The second exception is invoked whenever the underlying justification for the rule is absent. The court should not adjudicate constitutional rights unnecessarily and it may be, in fact, that the holders of the rights do not wish to assert them. On the other hand, if there is a special relationship between the proponent and the third parties, in some circumstances standing should be recognized. "If the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue, the court at least can be sure that its construction of the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit." *Singleton v. Wulff*, 428 U.S. at 114–15, 96 S.Ct. at 2874–2875 (1976). In that circumstance, the relationship between the third parties and the litigant may be such that he will be affected just as deeply as the rightholders.

As a predicate, the relationship of the parties and the congruency of their interests must be scrutinized. The problem is illustrated by *Friedman v. Harold*, 638 F.2d 262 (1st Cir. 1981). There, a trustee in bankruptcy sought to set aside a Massachusetts statute that prohibited creditors from attaching a wife's interest in entireties property, but imposed no such limitation on creditors of the husband. The trustee asserted a claim of gender discrimination, purportedly on behalf of the debtor's wife.

The Court of Appeals observed that the wife did not wish to assert any such right because she would be economically injured if it were recognized. The trustee's contentions thus clashed with the third party's own interest. The court approached the matter from the rightholder's standpoint, rather than the trustee's, and noted there was no obstacle to the wife's invocation of the right, had she been so inclined. Therefore, there was no need to entertain the claim by the trustee.

In *Frissell v. Rizzo*, 597 F.2d 840 (3d Cir.), *cert. denied*, 444 U.S. 841, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979), we expressed concern with avoidance of "ephemeral litigation," and the possibility that "litigants may, by exaggeration or understatement, distort the interest of those not parties to the suit...." *Id.* at 844. We observed that the mere fact that the litigant has suffered an injury, as in *Friedman*, is not enough to permit him to assert any right he chooses on behalf of third parties. A court need not embark on exposition of evanescent third-party rights merely to satisfy the curiosity of, or unrelated economic interests

of, a litigant. From that perspective, the fact that the statute challenged here has been amended and is no longer a source of injury to the third parties assumes large, if not decisive proportions.

The identity of interests between Sears and the nonfreeholders is far from obvious. In *Eisenstadt* and *Craig* the vendors were the best available litigants because the statute regulating their behavior directly affected rights of the third parties. In *Craig*, for example, the ban on the distribution of beer denied it to third parties and consequently deprived them of their rights. Thus, there was truly a community of interest between vendor and vendee.

That situation is not the same as the one here. As we observed on the first appeal, the challenged statute was designed to make it somewhat difficult to obtain handguns or ammunition by restricting the class of persons who could provide the required identifications. 593 F.2d at 530. Sears would have us hold that the classification is unduly restrictive. But an examination of Sears' stake shows that its interest and that of the class whose rights it purports to assert are not the same. 593 F.2d at 530.

There is no reason to assume Sears' sales would improve as a result of having purchasers establish responsibility by references from reputable citizens. To the contrary, the absence of any such requirement might bring about an increase in the gun business. In this case, Sears sold the ammunition without any person identifying the purchaser, and the nonfreeholder's interest in gun control was irrelevant. At least as to this sale, the company's economic interests would not have been furthered by the availability of nonfreeholder vouching.

In *Craig*, the majority observed that in general standing had been given to vendors who resisted efforts to restrict their markets by acting as advocates of third parties who sought access to the litigants' market or function. Here, the nonfreeholders do not intend to enter Sears' markets or undertake its function of selling firearms, but in fact, desire to prevent gun sales to those who would misuse them. To carry out that objective, the legislature could validly require identification by a much more limited group, the local police chief or sheriff, for example. The obligation on Sears to obtain identification would remain the same, and a violation would still carry the same sanctions, but it is doubtful that Sears would have standing to champion the cause of citizens who wished to participate in the regulatory function.

This case does not present a situation where an ineligible person furnished the identification, but rather one where none was provided. The composition of the group from which the identification could have been secured, but was not, is therefore irrelevant. Sears has not demonstrated a causal connection between the violation that exposes it to liability and the rights it seeks to assert on behalf of third parties.

### III.

The third exception, broad constitutional policy, is likewise not applicable here. When the constitutional question at issue implicates a fundamental right, the prohibition against *jus tertii* is not enforced. In *Barrows v. Jackson*, for example, where the issue was racial discrimination in property ownership, standing was recognized. In *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), the proprietor of a private school was permitted to litigate the interest of parents and children in child rearing and education. And in *Carey v. Population Services International*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), the Court extended standing to a vendor when its customers' privacy rights were asserted.

No such important constitutional issues are raised here, however. The right of citizens to participate directly in law enforcement procedures has never been considered to be a fundamental right and, in fact, is more of a burden. The tendency of government is to delegate such responsibilities to professional law enforcement officials. Thus, if the vouching function were limited to the county sheriff or the local police chief, for example, neither freeholder

nor nonfreeholder would participate in this particular phase of gun control. It is extremely unlikely that such delegation would fail to survive a constitutional challenge.

The "right" to participate in this field of law enforcement is far removed from such matters as freedom from discrimination in voting, owning property, or availing oneself of first amendment rights of association, privacy, the exercise of religion, and rearing children. Consequently, no persuasive reason has been advanced to justify dispensing with the rule against the assertion of *jus tertii* on the grounds that serious or fundamental constitutional issues are presented.

Finding no standing on the part of the defendant to raise the constitutional rights of nonfreeholders, I would not reach the equal protection issue, but rather would vacate the judgment of the district court.