790 F.2d 328
 54 USLW 2587
 David H. DEIBLER, Appellant,
v.
The CITY OF REHOBOTH BEACH, Miriam E. Howard, Mary Burt
Lankford, Paul H. Wellborn, Eleanor B. Lynam,
Eugene Nelson, Richard H. Derrickson and
Lawrence I. Turner, Appellees.
 No. 85-5495.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 21, 1986.
Decided May 5, 1986.
Rehearing and Rehearing In Banc Denied May 29, 1986.
 
 1
 James B. Tyler, III (argued), Georgetown, Del., for appellant.
 
 
 2
 Jeffrey S. Goddess (argued), Wilmington, Del., for appellees.
 
 
 3
 Before WEIS and SLOVITER, Circuit Judges, and ZIEGLER,* District Judge.
 
 OPINION ANNOUNCING THE JUDGMENT OF THE COURT
 
 4
 ZIEGLER, District Judge.
 
 
 5
 The instant case presents the question whether a provision of the chapter of the City of Rehoboth Beach, Delaware, which requires that a candidate for the elected position of commissioner be a nondelinquent taxpayer and freeholder, violates the rights of association, due process and equal protection of the Fourteenth Amendment. We hold that the ballot access restriction is not rationally related to any legitimate governmental interest and violates the equal protection clause of the Fourteenth Amendment. The judgment of the district court will be reversed.
 
 I.
 
 6
 The City of Rehoboth Beach is a resort community on the Atlantic coast of Delaware. The city is governed by a seven-member commission. Four members, one of whom serves as mayor, are residents. The remaining members are nonresidents. The charter provides that commissioners and candidates for the position must be at least 21 years old, current in their tax payments and owners of real estate within the city. The charter also provides that the commissioners are to judge, during a July meeting, whether a candidate meets these qualifications for the August election.
 
 
 7
 Appellant, David H. Deibler, decided to be a candidate for one of two vacant, nonresident commissioner seats in the election of August 1981. When he filed a nominating petition in early July, appellant was a resident of Maryland and the owner of four parcels of land in Rehoboth Beach. After reviewing appellant's petition and finding no errors, a city clerk accepted the petition and forwarded it to the commissioners. At the July 1981 meeting, while appellant was attending a boat show in Florida, the commissioners rejected the petition because Deibler did not meet the requirement of the charter that a candidate be a non-delinquent taxable. Appellant owed $264 in real estate taxes.
 
 
 8
 Deibler was an organizer and member of the Rehoboth Concerned Taxpayers Association, a group of business owners who disagreed with and criticized the tax policies of the city. Appellant and other members of the association apparently paid their disputed tax obligations into an escrow account while striving to reform the city's tax structure and rates. Appellant claims that he intended to run for office to represent the views of the association.
 
 
 9
 Alleging that the city, various commissioners and the manager of Rehoboth Beach denied him access to the ballot, appellant filed a civil action under 42 U.S.C. Sec. 1983, seeking a declaratory judgment, compensatory and punitive damages. The complaint asserts that the charter provision, which requires candidates to be non-delinquent taxables and freeholders, denied appellant the right to freedom of political association and equal protection under the First and Fourteenth Amendments to the United States Constitution.
 
 
 10
 The district court entered summary judgment for the city and its officials. Based on an equal protection analysis, the court held that the non-delinquency requirement bears a rational relationship to the municipality's legitimate interest in securing candidates for the position of commissioner who demonstrate community interest and commitment. The district court did not consider appellant's First Amendment claim because the motion for summary judgment and the arguments of the parties focused on the equal protection claim. Deibler v. City of Rehoboth Beach, No. 83-436, slip op. at 7, n. 6 (D.Del. June 26, 1985). The First Amendment claim has been raised in this appeal and we will address that claim, as well as the equal protection holding of the district court.
 
 II.
 
 11
 Section 3(a) of the charter of Rehoboth Beach provides in relevant part:
 
 
 12
 The government of The City and the exercise of all power conferred by this Charter, except as otherwise provided herein, shall be vested in The Commissioners of Rehoboth Beach.... Each of the seven (7) Commissioners of Rehoboth Beach, at the time of the approval of his qualifications by The Commissioners as hereinafter provided or at the time of his appointment as the case may be, and throughout his term of office, shall have attained the age of twenty-one (21) years of age, be a non-delinquent taxable of The City and a freeholder of The City....
 
 
 13
 Appellant challenges the language requiring that a candidate for commissioner "be a non-delinquent taxable of The City and a freeholder of the City."
 
 
 14
 Preliminarily, we must define the scope of appellant's standing to challenge the charter provision and then refine the issues presented. As the district court correctly held, appellant's claimed injury was caused by the requirement of non-delinquency, not by the freeholder requirement. Appellant is not a proper party to contest the freeholder requirement and, therefore, we cannot pass on the constitutionality of that provision. Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1974). However, we may consider the propriety of the freeholder requirement insofar as it bears upon the constitutionality of the non-delinquency requirement. A legislative phrase should be viewed in the context of the entire legislation and not in a vacuum. See Dunn v. United States, 775 F.2d 99, 103 (3d Cir.1985).
 
 
 15
 Secondly, unlike the district court, we conclude that appellant's status as a nonresident candidate is not relevant to the issues presented. The district court noted that Rehoboth Beach voluntarily extended representation and gave a voice in government to nonresident landowners of the resort city. The court then defined the issue as the validity "of distinguishing between nonresident owners of real estate who have met their tax responsibilities and nonresident owners of real estate who have not." In our judgment, Deibler's nonresident status is merely adventitious because the non-delinquency requirement applies to both resident and nonresident candidates.
 
 
 16
 Finally, we note that appellant may be advocating surgery for a terminally ill patient. Appellant urges that we dissect the non-delinquency language from an election scheme that, even the appellees concede, may violate the "one person-one vote" rule of Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), because the nonresident vote of freeholders may arguably dilute the voting strength of resident voters. See Lucas v. Colorado General Assembly, 377 U.S. 713, 736, 84 S.Ct. 1459, 1473, 12 L.Ed.2d 632 (1964). Moreover, candidacy tied to the ownership of real property was held to violate the equal protection clause in Turner v. Fouche, 396 U.S. 346, 362-363, 90 S.Ct. 532, 541-542, 24 L.Ed.2d 567 (1970), as was a similar provision in the town charter of Frederica, Delaware. Gebelein v. Nashold, 406 A.2d 279 (Del.Ch.1979). We turn now to the questions presented.
 
 III.
 
 17
 Deibler advances three arguments in this appeal. First, the commissioners of Rehoboth Beach denied procedural due process when they rejected his nominating petition. Second, the non-delinquency requirement should be accorded heightened scrutiny because it burdened his First Amendment right of association. And third, the non-delinquency requirement lacks a rational relationship to any legitimate governmental interest.
 
 A. Procedural Due Process
 
 18
 After collecting the necessary number of signatures, appellant presented a nominating petition to the clerk of Rehoboth Beach. Unfamiliar with the requirement that candidates be non-delinquent taxpayers, the clerk approved the petition and forwarded the document to the commissioners. Appellant, apparently satisfied with the clerk's review and knowing that the commissioners had final approval of the petition, did not attend the meeting of the commissioners. After the petition was rejected, appellant argued in the district court that he was denied notice of the non-delinquency requirement prior to the rejection and was denied an opportunity to be heard. The district court rejected the claim, and we agree with that conclusion.
 
 
 19
 The Fourteenth Amendment commands that no state shall deprive any person of life, liberty or property without due process of law. Procedural due process involves three elements. State action must burden a protected right. Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). The right must be deprived without a fair hearing either because a claimant did not receive adequate notice, Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), or a reasonable opportunity to be heard. Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).
 
 
 20
 Appellant contends that he was denied the "availability of political opportunity." Lubin v. Panish, 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974). Although the argument is not entirely clear, appellant apparently contends that he should have been notified by the clerk or by other city officials that his petition would be disqualified by the commissioners due to tax delinquency.
 
 
 21
 Section 3(a) of the city charter, governing the composition and qualifications of the seven-member commission, provides that nominees be non-delinquent taxables of the city. Section 6(b) states that candidates must possess the qualifications set forth in section 3(a), and that the commissioners shall determine at their regular July meeting whether a candidate meets such qualifications. There is no evidence of record that appellant was advised that it was unnecessary to attend this meeting or that he would be unable to speak and defend his petition.
 
 
 22
 The charter provides a nominating procedure which affords a candidate with notice of the commissioners' hearing and fair notice of the standards by which petitions will be judged. Procedural due process requires no more. Appellant's claimed ignorance of the charter provisions is unpersuasive. "All persons are charged with knowledge of the provisions of statutes and must take note of the procedure adopted by them; and when that procedure is not unreasonable or arbitrary there are not constitutional limitations relieving them from conforming to it." Texaco, Inc. v. Short, 454 U.S. 516, 532 n. 25, 102 S.Ct. 781, 793 n. 25, 70 L.Ed.2d 738 (1982).
 
 B. Right of Association
 
 23
 A group of Rehoboth Beach business owners, including appellant, organized the Rehoboth Concerned Taxpayers Association. Members paid certain tax obligations into an escrow account to persuade the city to change its tax policies. In 1981, appellant chose to run for commissioner to represent the views of the association. According to appellant, the rejection of his nominating petition due to tax delinquency denied a political association access to the ballot.
 
 
 24
 The right of political association derives from the First Amendment rights of freedom of speech, petition for redress of grievances and peaceable assembly. Cousins v. Wigoda, 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975). "There can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments." Kusper v. Pontikes, 414 U.S. 51, 56-57, 94 S.Ct. 303, 307-308, 38 L.Ed.2d 260 (1973). Such protection reflects the Supreme Court's recognition that "[c]ompetition in ideas and governmental policies is at the core of our electoral process...." Williams v. Rhodes, 393 U.S. 23, 32, 89 S.Ct. 5, 11, 21 L.Ed.2d 24 (1968).
 
 
 25
 The right of association extends beyond the mere formation of a political group. The right encompasses the availability of political opportunity for the group. Anderson v. Celebrezze, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). Although the right of association has greatest urgency in election matters, neither the right to associate nor the right to participate in political activities is absolute. CBS, Inc. v. Federal Communications Commission, 453 U.S. 367, 101 S.Ct. 2813, 69 L.Ed.2d 706 (1981); Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).
 
 
 26
 In Anderson v. Celebreeze, the most recent ballot restriction case, the Supreme Court enunciated the following test to determine whether a restriction unreasonably burdens associational rights.
 
 
 27
 [The court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.
 
 
 28
 460 U.S. at 789, 103 S.Ct. at 1570. Because the right of association is fundamental, the Court employed a due process balancing test, weighing the magnitude of the burden against the importance of the governmental interest. See also Buckley v. Valeo, 424 U.S. 1, 25, 96 S.Ct. 612, 637, 46 L.Ed.2d 659 (1976).
 
 
 29
 The Court has recognized that ballot access restrictions may burden both "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979). However, not all restrictions on candidate eligibility "impose constitutionally suspect burdens on voters' rights to associate or to choose among candidates." Anderson v. Celebrezze, supra, 460 U.S. at 788, 103 S.Ct. at 1569. The Court has upheld evenhanded restrictions governing filing deadlines and nominating petitions. American Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974); Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971).
 
 
 30
 When election rules present unreasonable barriers for certain political groups, the Court has found constitutionally suspect burdens on the right of association. In Anderson, for example, the filing deadline for independent presidential candidates was constitutionally infirm because it prevented the emergence of an independent candidate after voters became dissatisfied with the candidates provided by two major political parties. The state's interest in providing voters with an extended opportunity to scrutinize presidential candidates was outweighed by the voters' right of association.
 
 
 31
 The non-delinquency requirement of the charter of Rehoboth Beach also operates "to exclude certain classes of candidates from the electoral process." Anderson, supra, 460 U.S. at 793, 103 S.Ct. at 1572. Excluded are those who, for economic political or other reasons, have not paid their tax obligations. Appellant claims that this burden is "constitutionally suspect" because he cannot participate in the association's tax protest and pursue elective office to advance the association's political views. Id. at 788, 103 S.Ct. at 1569. Deibler seeks constitutional protection for his right to seek elective office to promote the association's views, and also for the act of not paying taxes.
 
 
 32
 If appellant had paid his taxes, he would not have been denied the opportunity to represent the views of the association as a candidate. This court has held that First Amendment freedoms are not abridged by the obligation to pay taxes. In Kahn v. United States, 753 F.2d 1208 (3d Cir.1985), we held that the failure to pay a tax, even as a means of political expression, is without First Amendment protection. See also United States v. Lee, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982). Where, as here, the ballot restriction of Rehoboth Beach does not inhibit the formation of a political association and does not deny the right of the Rehoboth Concerned Taxpayers Association to advance a representative candidate, the burden is not constitutionally suspect. We hold that balancing the legitimacy of the governmental interests in requiring non-delinquency in the Rehoboth Beach charter is not required because appellant has failed to advance any constitutionally suspect burden.
 
 C. Equal Protection
 
 33
 Deibler's final challenge is based on the equal protection clause of the Fourteenth Amendment. Appellant contends that the classifications drawn by the non-delinquency qualification for candidates serve neither a compelling state interest nor rationally relate to a legitimate state interest.
 
 
 34
 At a minimum, the equal protection clause's command that no state shall "deny to any person within its jurisdiction the equal protection of the laws" requires that a statutory classification be rationally related to a legitimate state interest. Cleburne v. Cleburne Living Center, Inc., --- U.S. ----, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). The level of scrutiny is heightened when the classification is based on gender or illegitimacy. Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); Mathews v. Lucas, 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976). These restrictions "will survive equal protection scrutiny to the extent they are substantially related to a legitimate state interest." Mills v. Habluetzel, 456 U.S. 91, 99, 102 S.Ct. 1549, 1554, 71 L.Ed.2d 770 (1982). The highest level of scrutiny, that is, strict scrutiny, is employed when a statute classifies by race, alienage or national origin or when the statute burdens personal, fundamental rights protected by the Constitution. Cleburne, supra 105 S.Ct. at 3255.
 
 
 35
 Appellant argues that a heightened level of scrutiny should be applied because the non-delinquency restriction burdens the fundamental right of association and the right to seek public office. As rehearsed, the ballot access restriction of Rehoboth Beach does not burden the right of association, and our fidelity to the common law tradition requires that we hold that the right to seek and hold public office is not a fundamental right protected by the Constitution. Bullock v. Carter, 405 U.S. 134, 142-43, 92 S.Ct. 849, 855-56, 31 L.Ed.2d 92 (1972). Therefore, because the restriction does not impinge upon a fundamental right and appellant has not championed any classification that merits heightened scrutiny, the restriction of the charter will survive scrutiny if the distinction rationally furthers a legitimate state purpose.
 
 
 36
 That rationality test does not involve a due process balancing of the rights of an individual against the government's interest, since a fundamental right is not involved. Buckley v. Valeo, 424 U.S. at 25, 96 S.Ct. at 637. Neither does the test consider whether the means chosen by the government are carefully tailored so that rights are not needlessly impaired. United Steelworkers of America v. Sadlowski, 457 U.S. 102, 102 S.Ct. 2339, 72 L.Ed.2d 707 (1982). The test focuses solely on whether the government acted beyond its legitimate interests by enacting irrational legislation.[1]
 
 
 37
 The issue here is whether a city charter can require that candidates for an elected, governing body be non-delinquent taxables. Such a qualification can be upheld if rationally related to a legitimate governmental interest. The issue brings together two forces steeped in American history--taxation and representation. With Great Britain's imposition of the Stamp Tax in 1765 and other revenue-raising measures as catalysts, the forces sparked the revolutionary protest that taxation without representation in Parliament was tyranny. To the early colonists, the power of taxation and the right to representation were rationally related. Likewise, government representation is rationally related to the imposition of taxes. Without representation, taxation would not be imposed. Few citizens would pay taxes voluntarily; by consenting to a system of government, citizens in effect have agreed to be coerced. S. Hansen, The Politics of Taxation: Revenue Without Representation, 271 (1983). The instant case presents a different relationship between taxation and representation. The relationship to be tested involves the payment of taxes, not the political theory behind imposing them, and the qualifications for elective office.
 
 
 38
 Appellees have asserted two interests to which the non-delinquency requirement is rationally related. They contend that the requirement screens those candidates who do not have the necessary commitment to the well-being of Rehoboth Beach. A candidate who does not pay taxes does not have the same degree of concern for the community as one who does pay, according to appellees. The second interest advanced is public respect for city government. Appellees argue that a commissioner who is delinquent in tax payments will create public cynicism for the commissioners and diminish their effectiveness among the electorate.
 
 
 39
 The first interest is not rationally served by the charter restriction on candidates. The individual's decision to pay taxes does not logically reflect his commitment to the city, because the decision may rest solely on economic, ideological or other personal grounds. In the most comprehensive study of its kind, Rutgers University's Center for Urban Policy Research conducted a survey of delinquent property taxpayers in Pittsburgh, Pennsylvania, in 1974. The survey found a broad range of rationales for delinquency. Most of the reasons reflected some aspect of the owner's immediate financial situation or considerations related to the operating costs of the property. R. Lake, Real Estate Tax Delinquency 158 (1979). Poor landowners more frequently cited lack of funds due to personal emergencies as the reason for delinquencies. Wealthier landowners frequently stated that payment of taxes would make no economic sense because the value of their properties was less than the tax delinquency, reflecting an attitude that the proper recourse for the city was a tax sale. Id. at 59. Of all landowners surveyed, 22 percent stated that a tax sale was preferable because their properties had little or no value. Among middle income landowners, the reasons cited for tax delinquency were: disputing the city's determination of delinquency (6.7 percent); general lack of money (20 percent); lack of money for personal reasons (23.3 percent); lack of money due to costs associated in operating the building (13.3 percent); administrative problems with a mortgage holder or legal problems delaying an estate settlement (10 percent); the habit of paying late to gain potential interest income (3.3 percent); and general conflict with the city tax policies and miscellaneous reasons (13.3 percent). Id. at 59. None of these reasons reflects in any way the landowner's level of commitment to city government. Moreover, a landowner may have a legitimate dispute with the city over the amount owed--no tax bill was sent, a city clerk made a clerical error, the landowner's check was lost, the payment was not recorded, etc. A delay in the settlement of an estate may cause the delinquency, or the ownership of the property may be disputed and a lawsuit ensues. Also, the mortgagor may pay taxes into an escrow account held by the mortgage lender and the lender has failed to make the tax payments. Finally, the landowner may not have the wherewithal to pay tax bills, rendering tax payments simply impossible. None of these taxpayers has evidenced any lack of commitment to the city. Their reasons for non-payment reflect general economic problems in the community, or stem from the actions of third parties beyond the taxpayers' control, or result from administrative tax collection errors. For the foregoing reasons, we hold that the non-delinquency restriction of the charter does not rationally relate to a governmental interest in securing candidates for commissioners who are committed to the City of Rehoboth Beach.
 
 
 40
 The second interest advanced by the city, avoidance of public cynicism of elected officials, is not rationally served by the charter restriction on candidates. This interest evokes popular conceptions of the superior standards to which elected officials should aspire. Appellees argue that only those candidates who pay taxes can earn the community's respect and obedience. While the electorate desires its representatives to exhibit high standards, the question remains whether a city charter, and not the popular vote, can define those standards.
 
 
 41
 Political scientists have long considered the standard of qualifications for elected officials. Adam Smith, the 18th century British economist, observed that political leadership requires a certain age and maturity, as well as wealth and residency. Such qualities are cherished by the populace, engender respect for the leader and influence citizens to obedience. A. Smith, Lectures on Police, Justice, Revenue and Arms 10-12 (1896). Smith viewed public utility in having rich, elderly landowners as civil magistrates. Even if Smith's observations are correct, the Supreme Court has condemned restrictions on candidates based on wealth and land ownership. Lubin v. Panish, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). As the Court held in Turner, equal protection is not served by such irrational classifications because they do not serve a legitimate governmental purpose, even one of engendering public respect.
 
 
 42
 Edmund Burke, the British parliamentarian and political philosopher, believed that the standards for public officials should be established by the electorate by vote. He believed a representative democracy required that elected officials should rise and fall on their own merit, and that the field of candidates should not be whittled down by legislative fiat. As a member of the British House of Commons in 1777, he wrote: "Believe me, it is a great truth, that there never was, for any long time, a corrupt representative of a virtuous people; or a mean, sluggish, careless people that ever had a good government of any form." E. Burke, The Philosophy of Edmund Burke 148 (1969). Burke's observation draws an illuminating distinction between the power of the electorate to determine its representative and the power of government to narrow the choices of candidates. Burke would hold that candidate qualifications should be as limited as possible to ensure that the electorate may elect representatives capable of representing its views. Qualifications beyond this threshold impinge on the ability of voters to secure a reasonable choice of candidates, under Burke's philosophy.
 
 
 43
 Likewise, James Madison, commenting on the qualifications for membership to the United States House of Representatives, criticized the enumeration of candidate qualifications beyond that necessary to elect true representatives of the people. He wrote: "Who are to be the objects of popular choice? Every citizen whose merit may recommend him to the esteem and confidence of his country. No qualification of wealth, of birth, of religious faith, or of civil profession is permitted to fetter the judgment or disappoint the inclination of the people." The Federalist Papers, No. 57 (1788).
 
 
 44
 The City of Rehoboth Beach argues that the ballot access restriction is needed to engender public respect for elected officials. Yet the city has engaged in a number of steps to limit the field of candidates and thwart the public policy, as Madison wrote, of electing the true representatives of the people. First, and foremost, the city permits only freeholders to run for commissioner. Can there be respect for a system that prevents the participation in government of what may be a majority of the electorate? Secondly, the city permits nonresident landowners to vote in municipal elections. Can there be true representation and a governing body deserving of respect and obedience when nonresidents exercise significant control? Finally, the city requires candidates to be current in their tax obligations as determined by the city tax office. Can there be respect for a system that summarily denies the privilege of elective office to those who, for reasons totally unrelated to their commitment to the community, do not pay taxes?
 
 
 45
 In imposing the ballot access restriction on candidates, the City of Rehoboth Beach has denied voters the opportunity to establish standards for their representatives through the power of the ballot box. We hold that such a restriction and its concomitant effect on representative government do not rationally relate to the city's asserted aim of public respect and obedience.
 
 
 46
 Finally, Deibler urges that the rule of Hill v. Stone, 421 U.S. 289, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975), namely, any voter qualifications beyond residence, age and citizenship are unconstitutional unless they serve a compelling state interest, be applied to candidate restrictions. We decline to do so because voting has been deemed a fundamental First Amendment right and running for office has not. Bullock v. Carter, supra. Nonetheless the proper standard, the lowest level of scrutiny under equal protection, requires consideration of "governmental interest." Such a standard, as well as any other analysis used by this court, necessarily encompasses genuine concern that principles of democratic government be preserved. Today, we consider the restriction of tax delinquency as an additional threshold qualification for an elected official. Tomorrow's restriction may concern failure to pay federal or state taxes. Thereafter, candidacy may be conditioned on municipal obligations such as sewer assessments, parking fines, dog law violations, jaywalking and other minor infractions. None of these potential qualifications bears on a candidate's maturity, intelligence, knowledge of the community, ability to recognize and solve community problems.
 
 
 47
 Each new qualification decreases a voter's choice and consequently harms democratic government. Analysis of equal protection and our understanding of the legitimate interests of society counsel that candidacy conditioned on the payment of taxes is inimical to democratic government.
 
 IV. Summary
 
 48
 The non-delinquency requirement of the charter of the City of Rehoboth Beach, Delaware, is not rationally related to the city's interests in the commitment of candidates to the community or in the public's respect for elected officials. The ballot access restriction violates the equal protection clause of the Fourteenth Amendment. Summary judgment for appellees will be reversed and the case will be remanded to the district court for further proceedings consistent with this opinion.
 
 
 49
 SLOVITER, Circuit Judge, concurring in the judgment.
 
 
 50
 I agree with Judge Ziegler that the requirement of the Charter of the City of Rehoboth Beach (City) that candidates for commissioners must be "non-delinquent taxables" of the City cannot be sustained against constitutional attack. However, I reach that decision by a somewhat different route from that traveled by Judge Ziegler.
 
 The Charter provision in question reads:
 
 51
 Section 3.
 
 
 52
 (a) The government of The City and the exercise of all power conferred by this Charter, except as otherwise provided herein, shall be vested in The Commissioners of Rehoboth Beach. The Commissioners of Rehoboth Beach shall consist of seven (7) members, to be chosen as hereinafter provided. One of said Commissioners shall have the title of Mayor of The City of Rehoboth Beach, with duties hereinafter to be prescribed, and who shall also be President of The Commissioners of Rehoboth Beach. Each of the seven (7) Commissioners of Rehoboth Beach, at the time of the approval of his qualifications by The Commissioners as hereinafter provided or at the time of his appointment as the case may be, and throughout his term of office, shall have attained the age of twenty-one (21) years of age, be a non-delinquent taxable of The City and a freeholder of The City. Three (3) of the said Commissioners shall reside outside the corporate limits of The City and three (3) of said Commissioners shall be bona fide residents of The City. The Commissioner with the title of Mayor of The City of Rehoboth Beach shall also be a bona fide resident of The City. If any one of The Commissioners, shall, during his term of office, cease to be a freeholder of The City, he shall ipso facto vacate his office. If any one of the resident Commissioners or if The Commissioner with the title of Mayor of The City of Rehoboth Beach shall cease during his term of office to be a bona fide resident of the City of Rehoboth Beach, he shall ipso facto vacate his office. If any one of the non-resident Commissioners shall become a resident of The City by reason of moving within the corporate limits of The City or by annexation or otherwise, he shall, ipso facto, vacate his office. The Commissioners shall be the judges of the qualifications of their members. For all purposes of this Charter, a "freeholder" shall be deemed to include any person who holds fee simple title to real property in his own name, or who holds title to an undivided interest in real property or who holds title to real estate as a tenant by the entirety.
 
 
 53
 App. at A-118.
 
 
 54
 In 1981, the City excluded Deibler's name from the ballot in an election of City Commissioners because he was not a "non-delinquent taxable," since it was found that he owed $264 in property tax. Deibler's complaint challenges that action as unconstitutional under both the First Amendment and the Equal Protection Clause of the United States Constitution and seeks a declaratory judgment to that effect in addition to damages.
 
 
 55
 It is axiomatic that courts "do not review issues, especially constitutional issues, until they have to." Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 154-55, 71 S.Ct. 624, 639-40, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). It follows that if the "non-delinquency" requirement cannot withstand an Equal Protection challenge, it is not necessary for this court to engage in a consideration of Deibler's First Amendment challenge. A First Amendment analysis is particularly tenuous in this case in light of the ambiguous nature of the record on certain relevant facts. If, in fact, Deibler were, as he presents himself in his brief, a representative of "part of an organization of business people, Rehoboth Concerned Taxpayers Association, that has been 'striving for fairer treatment in the paying of taxes and mercantile licenses' ", and if this group "had put some of the money they owed the City in common escrow accounts," Appellant's brief at 8, as a "protest", then the non-delinquent requirement might burden access to the political process "by those outside the 'mainstream' of political life." See Clements v. Fashing, 457 U.S. 957, 964-65, 102 S.Ct. 2836, 2844-45, 73 L.Ed.2d 508 (1982) (plurality opinion); Anderson v. Celebrezze, 460 U.S. 780, 793-95, 103 S.Ct. 1564, 1572-73, 75 L.Ed.2d 547 (1983). In this case, however, we do not have any findings by the district court on the associational interests, if any, involved, because the First Amendment claim was not given as a basis for summary judgment. Instead, the district court focused entirely on plaintiff's Equal Protection claim. In this posture, I see no reason for this court to address the First Amendment issue.
 
 
 56
 Moreover, the need to restrict constitutional analysis to that which is absolutely necessary also cautions us to resist deciding whether a fundamental right is implicated if the classification cannot withstand analysis even under the rational basis test of the Equal Protection Clause. The Supreme Court engaged in precisely such restraint in Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), when it declined to decide whether Georgia had a "compelling" interest in support of its freeholder requirement for school-board membership because it concluded that "the Georgia freeholder requirement must fall even when measured by the traditional test for a denial of equal protection: whether the challenged classification rests on grounds wholly irrelevant to the achievement of a valid state objective." Id. 396 U.S. at 362, 90 S.Ct. at 541. The level of scrutiny to be applied to restrictions on the right of candidacy is a sufficiently unsettled area that I would hesitate to reject the possibility of some heightened scrutiny. Since I conclude that the non-delinquency requirement does not survive even the rational relation test, I see no need to reach any other inquiry.
 
 
 57
 Finally, unlike Judge Ziegler, I do not believe that Deibler's status as a nonresident is irrelevant. On the contrary, I believe that the City's efforts to distribute its commissioners among residents and nonresidents alike is a crucial element in our analysis of the permissibility of the non-delinquent taxpayer requirement.
 
 
 58
 I agree with the district court and Judge Weis, who dissents, that even though the Supreme Court has not issued a definitive holding on the issue, it would be constitutionally permissible to limit candidacy to those persons resident of the state or municipality. Cf. Holt Civic Club v. Tuscaloosa, 439 U.S. 60, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978) (approving voter residency requirement). I disagree with their reasoning that because a community permits nonresidents to be candidates as a matter of legislative grace, it may burden the nonresident's candidacy with restrictions that may be otherwise impermissible. The Supreme Court has categorically rejected the "bitter with the sweet" approach in the due process context. In Cleveland Board of Education v. Loudermill, --- U.S. ----, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985), it held that the legislature's grant of a substantive right which it was not compelled to provide did not give the legislature the prerogative to impose unlimited conditions upon the exercise of the right. I believe that analogous reasoning would apply here. The City's commendable effort to enfranchise nonresidents and to insure nonresidents' participation in the leadership of the City does not ipso facto permit conditioning nonresident candidacy on tax non-delinquency.
 
 
 59
 "The State may not deny to some the privilege of holding public office that it extends to others on the basis of distinctions that violate federal constitutional guarantees." Turner v. Fouche, 396 U.S. at 362-63, 90 S.Ct. at 541-42. Thus, we must inquire whether tax non-delinquency is a legitimate condition for candidacy in general, and, if not, whether there is something particular about nonresidents' candidacy that justifies application of this condition only to them.
 
 
 60
 The district court did not suggest that the non-delinquency condition would be permissible when applied to all candidates. After concluding that "being current in the payment of one's taxes is sufficiently underinclusive and overexclusive as a classification that it would not pass constitutional muster if strict scrutiny were the required test," it held that the condition passed the rational relation test because the "non-delinquent distinction is being applied in the context of a class consisting solely of nonresident, real property owners." App. at A-205. It is clear from the district court's opinion that the key for it was the application of the non-delinquency condition only to nonresident property owners. Similarly, Judge Weis in his dissent limits his approval of the non-delinquency condition as one that may be imposed only on nonresidents. The City itself proffers no justification for non-delinquency as a generally applicable condition and, in fact, in oral argument advised the court that it is presently enforcing neither the freeholder requirement nor the non-delinquency requirement with respect to its resident commissioners.
 
 
 61
 The traditional candidacy requirements such as age and durational residence have been sustained on the basis of their relationship to the legitimate concerns of ensuring that public office holders are mature enough to deal with public affairs responsibly and effectively, see, e.g., Human Rights Party of Ann Arbor v. Secretary of State For Michigan, 370 F.Supp. 921, 924 (E.D.Mich.), aff'd mem., 414 U.S. 1058, 94 S.Ct. 563, 38 L.Ed.2d 465 (1973) (requirement that school board candidates be 18 years old), or ensuring the candidates' familiarity with local affairs and exposure to long-term voter scrutiny, see, e.g., Sununu v. Stark, 383 F.Supp. 1287, 1290-91 (D.N.H.1974), aff'd mem., 420 U.S. 958, 95 S.Ct. 1346, 43 L.Ed.2d 435 (1975) (7 year residence requirement for state senatorial candidates).
 
 
 62
 However, the Supreme Court held a freeholder requirement for school-board membership to be irrational because, inter alia, "the lack of ownership of realty [does not] establish a lack of attachment to the community and its educational values." Turner v. Fouche, 396 U.S. at 364, 90 S.Ct. at 542. The Court continued, "However reasonable the assumption that those who own realty do possess such an attachment, Georgia may not rationally presume that that quality is necessarily wanting in all citizens of the county whose estates are less than freehold." Id. Applying similar analysis here, I agree with Judge Ziegler that the non-delinquency condition does not rationally relate to the two interests advanced by the City, concern for the community and public respect for city government. In determining qualifications for resident candidates, the City may not presume those qualities are necessarily wanting in all persons delinquent in their property taxes. Moreover, I am concerned that the reasons given may not themselves be legitimate government interests because they imply an inappropriate meddling in the quality of the candidate, an issue traditionally left to the electorate. Cf. Communist Party of Indiana v. Whitcomb, 414 U.S. 441, 94 S.Ct. 656, 38 L.Ed.2d 635 (1974) (statutory requirement that candidates abjure advocacy of the overthrow of the government by force or violence held to violate the First Amendment).
 
 
 63
 On the other hand, I believe that a community that opens participation in its political process to nonresidents can limit that participation to persons with some attachment to the community. This may present one of those rare "other circumstances" referred to in Turner v. Fouche "in which a property qualification for office-holding could survive constitutional scrutiny," 396 U.S. at 364, 90 S.Ct. at 542, as long as the City provided a comparable opportunity to nonresident candidates without the economic means to be freeholders, such as one based on a record of consistent seasonal renting or employment. Cf. Lubin v. Panish, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974) (state must provide alternative to filing fees for indigent candidates).
 
 
 64
 A residency requirement is legitimate because it shows an attachment to the community. A residency requirement for voters has been justified because it "may be necessary to preserve the basic conception of a political community," Dunn v. Blumstein, 405 U.S. 330, 344, 92 S.Ct. 995, 1004, 31 L.Ed.2d 274 (1972), and the same rationale may be applied equally to candidates. It follows that a City that permits nonresident candidates may impose a condition that serves as a legitimate substitute for residency to show the genuineness of community attachment.
 
 
 65
 The difficulty with non-delinquency as a condition is that it does not serve as a legitimate substitute for residency. Using analysis similar to that applied by the Court in Turner v. Fouche, supra, even if we assume that nonresident freeholders who are not tax delinquent have an attachment to the community, we may not rationally presume such an attachment is wanting in those who are tax delinquent. The nexus between non-delinquency and attachment to the community is no stronger for nonresident candidates than it is for resident candidates.
 
 
 66
 For those reasons, I believe the district court erred in sustaining the constitutionality of the non-delinquency condition for nonresident candidates, and I join in the judgment reversing the grant of summary judgment to the City.
 
 
 67
 WEIS, Circuit Judge, dissenting.
 
 
 68
 My difference with Judge Ziegler is based on the formulation of the legal question presented in this case. The district court found the issue to be a narrow one--whether nonresident property owners who wish to be candidates for the city commission may, as a prerequisite, be required to be current in their property taxes. Judge Ziegler, however, finds the issue to be much broader--"whether a city charter can require that candidates for an elected, governing body be non-delinquent taxables." That approach removes two circumstances from consideration--nonresidency and property ownership. By deleting those factors from the equation, a case is presented which differs substantially from the one decided by the district court.
 
 
 69
 I agree that plaintiff is not a proper party to contest the freeholder requirement, and therefore that qualification is not before us. I differ, however, with the determination that nonresidency is not relevant. On the contrary, I believe it to be a key factor in the resolution of this case.
 
 
 70
 A local government may limit its political offices to persons residing within its geographic borders, Holt Civic Club v. Tuscaloosa, 439 U.S. 60, 68-69, 99 S.Ct. 383, 388-89, 58 L.Ed.2d 292 (1978), but it is doubtful whether a government may condition a resident's candidacy on the ownership of real property. See Turner v. Fouche, 396 U.S. 346, 361-64, 90 S.Ct. 532, 540-42, 24 L.Ed.2d 567 (1970); Gebelein v. Nashold, 406 A.2d 279 (Del.Ch.1979).
 
 
 71
 As a nonresident, plaintiff has no constitutional right to run for the Rehoboth Beach City Commission. The city's decision to permit nonresidents' candidacy is a matter of legislative grace and therefore they stand in a quite different posture than residents. Classification by residency rest on a distinct factual and legal basis, and restrictions that may not be imposed on a resident may nevertheless in some instances be applied to a nonresident. Indeed, in some circumstances it may be impermissible to treat resident and nonresident candidates alike. Jenness v. Fortson, 403 U.S. 431, 441, 91 S.Ct. 1970, 1975, 29 L.Ed.2d 554 (1971).
 
 
 72
 In choosing to treat the two classes similarly, the result inevitably is to use the more rigorous standards applicable to residents. In so doing, the court impinges on the municipality's ability to restrict nonresident candidates to those it believes have demonstrated some sense of community responsibility.[1]
 
 
 73
 I accept the conclusion that the rational relationship test is appropriate here, but am unable to agree that its application must result in nullification of the nondelinquency requisite. The municipality has advanced two interests, which it contends are served by that condition: (1) evidence of commitment to the well-being of the community, and (2) public respect for local government.
 
 
 74
 The majority rejects both of these interests, noting that tax delinquency may be caused by a variety of reasons, some of which are economic in nature. The majority also expresses concern that the imposition of threshold qualifications unduly narrows the field of available candidates. Both of these evaluations are only subjective differences of opinion with the municipality, and those are not proper grounds for a finding of unconstitutionality.
 
 
 75
 Economic reasons for tax delinquency are not before the court. Plaintiff may not rely on them because they do not apply to him. He is a person of some means and testified that had he known that delinquency would disqualify his candidacy, he would have paid the $264 tax due. Plaintiff may not facially attack the charter but is limited to challenging its constitutionality to the extent it has been applied to him. See Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). See also Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); Lubin v. Panish, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); Frissell v. Rizzo, 597 F.2d 840, 844 (3d Cir.1979). That being so, a court may not reach out to invalidate an ordinance on grounds broader than those that may permissibly be presented by a particular party.
 
 
 76
 Moreover, the property owner survey is highly questionable authority when applied to Rehoboth Beach. The demographic and economic conditions in Pittsburgh are quite different from those of an affluent beach-front community. Even so, it is interesting that a number of delinquents listed in the survey stated that they did not pay taxes because the value of their property was less than the amount of tax due. Perhaps some of these owners had allowed their property to deteriorate and had permitted delinquencies to accumulate as part of a deliberate effort to extract profits while reducing expenditures by failing to meet their tax obligations to the community. I cannot conclude that the city acted irrationally in deciding that such action indicates a lack of community responsibility.
 
 
 77
 Similarly, I am not convinced that a local government does not have a legitimate interest in reducing public cynicism about the integrity and commitment of its office holders. A law requiring that candidates be current in taxes may promote respect for public officials and may reduce distrust. For instance, the frequency with which news media publicize a local official's failure to pay his taxes or parking tickets reflects the citizenry's interest in the matter. That the publicity has been particularly effective in bringing about speedy payment is also evidence that office holders consider public reaction to the news as important.
 
 
 78
 Obviously, currency in tax obligation is but one factor, probably a small one, in establishing the sense of responsibility and maturity that a candidate for public office should demonstrate. Nevertheless, I do not understand why that element should not be considered to bear some rational relationship to the community's need for able and conscientious leadership. From an equal protection standpoint, a classification is not deficient merely because the state could have selected other and perhaps more effective means of achieving the desired ends. See Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 316, 96 S.Ct. 2562, 2568, 49 L.Ed.2d 520 (1976); Mathews v. Diaz, 426 U.S. 67, 83, 96 S.Ct. 1883, 1893, 48 L.Ed.2d 478 (1976).
 
 
 79
 It must be emphasized that the nondelinquency constraint as applied to nonresidents is not invidious in any way. Nor does it impose any additional obligation that candidates do not already have as citizens. The candidates are not required to satisfy a discriminatory exaction to be on the ballot but only to pay what they, and every other citizen similarly situated, owe as taxes.
 
 
 80
 In sum, I agree with the district court that the City Of Rehoboth Beach has demonstrated a rational basis for imposing the nondelinquency requirement, and therefore I would affirm.
 
 
 
 *
 The Honorable Donald E. Ziegler, United States District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 The minimum rationality test, framed by the Supreme Court in Railway Express Agency, Inc. v. New York, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949), began as a simple test designed to uphold the constitutionality of economic and social legislation. When faced with classifications based on race, alienage and gender, the Court found that interests of equal protection were not served by mere rationality to a governmental interest. Heightened scrutiny became the test for these classifications. As the Court encountered additional classifications that arguably merited a higher level of scrutiny, i.e., the aged and the mentally retarded, the Court used minimum rationality to strike down the legislation rather than expand the higher scrutiny categories. See, e.g., Cleburne v. Cleburne Living Center, Inc., --- U.S. ----, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). As a result, what once was direct and objective has become perhaps the most sophisticated and subjective of judicial tests. Under Cleburne Living Center, supra, and Hooper v. Bernalillo County Assessor, --- U.S. ----, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985), the minimum rationality analysis calls upon the judge's personal understanding of the needs of society
 
 
 [1]
 I need not, and do not, address the validity of the requirement that a resident candidate for local office be current in his tax obligations. That property ownership is an impermissible qualification for a resident's candidacy does not resolve the tax delinquency issue for that class of candidates because other forms of taxation may be imposed on non-freeholders, e.g., income, wage, or personal property taxes. Liability for municipal taxes need not be confined to real property owners